DAVID P. OSBORNE, JR. vs. BARBARA M. OSBORNE.

Norfolk. September 17, 1981. — November 13, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Contract,* Antenuptial agreement, Duress. *Husband and Wife,* Antenuptial agreement, Gift. *Gift.*

An antenuptial contract settling the alimony or property rights of the parties in the event of divorce is not per se against public policy and may be specifically enforced. [595-598]

Discussion of the extent to which an antenuptial agreement should be enforced in the event of divorce. [599]

Neither G. L. c. 209, § 25, nor a rule of common law precludes the parties to an antenuptial agreement from determining in advance of their marriage their rights with respect to property acquired during the marriage. [600]

In proceedings for divorce, a master's finding that the husband was not under duress when he entered an antenuptial contract was supported by ample evidence and thus was not clearly erroneous. [600-601]

In proceedings for divorce, a master's findings that the wife did not intend a gift to the husband of a one-half interest in three parcels of real estate, to which legal title was in their names jointly and which she acquired during the marriage, either by gift from her family or by purchase with her own funds, were not plainly wrong and were binding on the probate judge and on this court. [601-605]

In proceedings for divorce, the evidence established no ownership interest of the husband in works of art purchased during the marriage and in other personal property. [605-606]

LIBELS for divorce filed in the Probate Court for the county of Norfolk on June 4, 1974, and May 9, 1975, respectively.

CIVIL ACTION commenced in the Probate Court for the county of Norfolk on February 28, 1975.

The cases were heard by *Ford*, J., on masters' reports.

The Supreme Judicial Court granted a request for direct appellate review.

*John P. Birmingham, Jr.* (*Alice D. Alexander* with him) for David P. Osborne, Jr.

*David M. Wright* (*Jacob M. Atwood* with him) for Barbara M. Osborne.

HENNESSEY, C.J. This is an appeal from Probate Court judgments entered in connection with reciprocal divorce actions by husband and wife, and in connection with an equity action brought by the husband to establish an ownership interest in certain real estate and personal property. The husband also seeks an award of alimony and a division of property pursuant to G. L. c. 208, § 34.[1] The alimony and property claims were referred to a master, who, after a hearing, filed a report concluding that the husband should receive neither alimony nor an equitable division of property, and that ownership of the property claimed in the equity complaint belonged solely to the wife.[2] Subsequently, upon motion of the husband, the probate judge submitted the case to a second master for additional subsidiary findings of fact on the needs of the parties and the contribution of the parties as homemakers. After the second master's report was filed, the probate judge struck the second master's report in its entirety, and adopted the first master's report, with the exception of the first master's findings relating to the husband's claim of joint ownership in three parcels of real property, which the court found to be jointly held.[3] Both parties appealed, and we granted the wife's application for direct appellate review.[4] The evidence has been reported.

---

[1] The wife has waived any claim for alimony or child support.

[2] The sole exception was the master's finding that one-half of a wine collection and certain articles of furniture belonged to the husband.

[3] The probate judge also struck a finding of the first master relating to the postseparation life-style of the husband.

[4] Shortly after the wife's application for direct appellate review was granted by this court, we entered, by agreement of the parties, an interlocutory order affirming the judgments nisi in so far as they granted the parties a divorce. We reserved, until briefing and arguing were completed, all decisions relating to the issues of alimony and division of property. In light of the fact that both parties had been seeking their divorce since 1975, more than six years ago, it was only appropriate to take this action. ·

The husband claims that the probate judge erred in adopting the first master's report because (1) the master failed to apply properly the factors enumerated in G. L. c. 208, § 34, relating to the needs of the parties and their station in life, (2) the master's findings relating to the husband's ownership interest in the personal property were against the weight of the evidence, and (3) the master improperly admitted certain prejudicial evidence relating to the postseparation conduct of the husband. On cross-appeal, the wife contends that the probate judge erred in (1) failing to give full effect to an antenuptial contract entered into by the parties in which both parties waived their rights to alimony or to any portion of the other's estate, and (2) striking so much of the first master's report that found the wife to be the sole owner of the three parcels of real estate.

We think that the judge erred in striking the master's findings regarding ownership of the real property. We also conclude that the judge was correct in denying the husband's claim for alimony or for assignment of any portion of his wife's estate; however, we do so on reasoning substantially different from that of the probate judge. It is apparent that neither the first master nor the probate judge was clear on what effect should be given the antenuptial contract. The court found that the husband was not in need of any alimony or assignment of property from the wife's estate, see G. L. c. 208, § 34, and thereby avoided the issue whether the antenuptial contract was effective to preclude the husband's claim. We conclude that the antenuptial contract is controlling on all claims of the husband, and, therefore, we do not reach the questions relating to the proper application of G. L. c. 208, § 34.

The relevant facts as found by the master are summarized. The parties, Barbara E. Mallinckrodt (Barbara) and David P. Osborne, Jr. (David), met and became engaged while they were both attending medical school. They were married on August 19, 1967. Barbara is an heiress to a large family fortune amounting to nearly $17,000,000, most of

which is held in trust. Barbara's income from these funds was approximately $540,000 in 1976. At the time of their engagement, David had no assets of significant value. A few hours before their wedding they executed an antenuptial agreement containing, among others, the following pertinent provisions: "Barbara now has sufficient property to provide adequate means for her own support and David, by reason of his becoming a member of the medical profession, contemplates that he will have adequate earning power for his own support"; "Barbara and David intend this agreement to be in full discharge of all . . . statutory marital property rights under the statutes or law of any state in which they are now or may hereafter be domiciled"; "neither, upon or subsequent to said marriage, shall acquire any interest, right or claim in or to the property, real and personal, of whatever kind or wherever situated, which the other now owns, possesses or is entitled to, or which the other may own, possess or become entitled to hereafter"; that if their "marriage is legally terminated in accordance with the laws of any jurisdiction in which they or either of them may be domiciled, then . . . neither shall be entitled to any alimony, support money, costs, attorneys fees, or to any other money by virtue thereof. This provision may be cited by either party by any court of competent jurisdiction, as a waiver and release of any money payment as aforesaid, by one to the other." Attached to the agreement was a schedule accurately showing Barbara's wealth and expectation of inheritance. David read the agreement before he signed it.

Two children were born of the marriage. During the marriage the parties maintained a high standard of living which was financed completely by the income from Barbara's trust accounts. Barbara maintained joint checking accounts upon which either party could draw funds. These accounts were funded with monies from her separate trust accounts. During the marriage the parties acquired furniture and fixtures worth approximately $15,000, jewelry valued at approximately $225,000, works of art valued at approximately $428,545, a

wine collection worth $60,000, and three parcels of real estate valued at $100,000, $60,000, and $40,000.[5] The husband claims an ownership interest in all these items of property. Both parties are now practicing physicians and earn respectable salaries. Further facts are set forth in the opinion.

*Validity of the Antenuptial Agreement.*

We must first determine the validity of the antenuptial agreement. This court has not previously passed on the validity of an antenuptial agreement that attempts to regulate the rights of the parties in the event of their subsequent divorce. The majority of Massachusetts cases dealing with the validity of antenuptial contracts concern the rights of the parties to modify those property rights that would otherwise arise during the marriage or upon the death of one of the parties. See, e.g., *Rosenberg* v. *Lipnick*, 377 Mass. 666 (1979) (abandoning the rule of *Wellington* v. *Rugg*, 243 Mass. 30 [1922], that common law fraud must be proved in order to invalidate an antenuptial contract); *French* v. *McAnarney*, 290 Mass. 544 (1935). These contracts have generally been upheld where there has been no fraudulent conduct on the part of either party, or, more recently, where the parties have acted honestly and fairly and have fully disclosed their assets one to the other. *Rosenberg* v. *Lipnick, supra.* Antenuptial contracts are recognized by statute and at common law. G. L. c. 209, §§ 25, 26. *Freeland* v. *Freeland,* 128 Mass. 509 (1880). *Jenkins* v. *Holt,* 109 Mass. 261 (1872).

In many jurisdictions it has been held that an antenuptial contract made in contemplation of divorce is void as against public policy. See generally 2 A. Lindey, Separation Agreements and Ante-Nuptial Contracts § 90, at 90-33 (1979 & Supp. 1981). The reasons most frequently given for invalidating such contracts are (1) they are not compatible with and denigrate the status of marriage, (2) they tend to facili-

---

[5] The values given are those that were assigned at the time of the hearing before the first master. The husband argues that for purposes of determining his ownership interest, values should be ascertained as of the date of the divorce decree. Our disposition of this case makes it unnecessary to decide this issue.

tate divorce by providing inducements to end the marriage, and (3) a contract waiving or minimizing alimony may turn a spouse into a ward of the State. See *Ferry* v. *Ferry*, 586 S.W.2d 782, 785-786 (Mo. App. 1979), for a discussion of the trend in the cases. Examples of cases adopting these views are *Norris* v. *Norris*, 174 N.W.2d 368 (Iowa 1970); *Crouch* v. *Crouch*, 53 Tenn. App. 594 (1964); *Fricke* v. *Fricke*, 257 Wis. 124 (1950). See also Klarman, Marital Agreements in Contemplation of Divorce, 10 U. Mich J.L. Ref. 397, 398 (1977); Annot. 57 A.L.R.2d 942 (1958).

In *Fox* v. *Davis*, 113 Mass. 255, 257-258 (1873), this court stated: "The great weight of authority sustains the validity of such contracts, where the separation has taken place, or is to take place immediately. But where the agreement is made in contemplation of future separation, the current of authority is against its validity." Had the issue come before this court several decades ago, the law as stated in *Fox* might well have been held to be controlling. In *French* v. *McAnarney*, 290 Mass. 544 (1935), it was held that an antenuptial contract wherein the wife agreed not to make any claim for support against the husband was void as against public policy. The facts of the case are distinguishable in that there the parties were not divorced; yet the rationale is applicable. The court in *French* concluded that certain rights and duties incident to the marital relation, including the duty of the husband to support his wife, could not be avoided by an antenuptial contract. Under the case law of the time, this same reasoning would have applied to the rights of the parties upon divorce, since the obligation of the husband to pay alimony was also based on the husband's legal duty to support his wife. *England* v. *England*, 329 Mass. 763, 764 (1952). See *Coe* v. *Coe*, 313 Mass. 232 (1943); H. Clark, Law of Domestic Relations in the United States 420 (1968). The holding in *French* has been followed in *Motley* v. *Motley*, 255 N.C. 190 (1961).

Perhaps the closest this court has come to addressing the issue is *Kovler* v. *Vagenheim*, 333 Mass. 252 (1955). *Kovler* involved a premarital contract between the husband and

the brothers of the wife, whereby the brothers, in consideration of the husband's marrying their sister, promised to indemnify the husband for any support and maintenance that he might be obliged to pay for his wife and child. After obtaining a divorce, the husband sought to enforce the contract. The court upheld the contract, concluding that since it was not in derogation of, but rather in aid of marriage, there was no violation of public policy in its enforcement. The court in *Kovler* did, however, state that "a contract tending to divest a husband of any obligation incidental to his marriage is invalid" (citing *French* v. *McAnarney, supra*), thus suggesting that if the husband's obligations had somehow been contractually divested, for example through a waiver of rights by the wife, then a different result would have been reached.

In 1970 the Supreme Court of Florida took the lead in departing from this approach.[6] In *Posner* v. *Posner*, 233 So. 2d 381 (Fla. 1970), the court held that antenuptial agreements settling alimony and property rights upon divorce are not void ab initio as contrary to public policy. The court disagreed with the traditional assumption that such agreements tended to facilitate divorce, suggesting that such contracts are no more likely to encourage divorce than antenuptial contracts in contemplation of death. *Id.* at 383-384. With respect to public policy, the court stated: "We know of no community or society in which the public policy that condemned a husband and wife to a lifetime of misery as an alternative to the opprobrium of divorce still exists. And a tendency to recognize this change in public policy and to give effect to the antenuptial agreements of the parties relating to divorce is clearly discernible." *Id.* at 384. A number of jurisdictions have followed the approach of the *Posner* case. *In re Marriage of Dawley*, 17 Cal. 3d 342 (1976). *In re Marriage of Ingels*, 42 Colo. App. 245 (1979) (holding limited

---

[6] One pre-1970 case, *Hudson* v. *Hudson*, 350 P.2d 596 (Okla. 1960), upheld an antenuptial contract in which each spouse waived alimony rights upon divorce; however, the decision met with virtual nonacceptance by other courts. See Gamble, The Antenuptial Contract, 26 U. Miami L. Rev. 692, 715 (1972).

to division of property). *Parniawski* v. *Parniawski*, 33 Conn. Supp. 44 (1976). *Burtoff* v. *Burtoff*, 418 A.2d 1085 (D.C. App. 1980). *Volid* v. *Volid*, 6 Ill. App. 3d 386 (1972). *Tomlinson* v. *Tomlinson*, 170 Ind. App. 331 (1976) (holding limited to division of property). *Flora* v. *Flora*, 166 Ind. App. 620 (1975). *Ferry* v. *Ferry*, 586 S.W.2d 782 (Mo. App. 1979). *Buettner* v. *Buettner*, 89 Nev. 39 (1973). *Unander* v. *Unander*, 265 Or. 102 (1973). Contra *In re Marriage of Newman*, 44 Colo. App. 307 (1980) (waiver of right to receive maintenance held void); *In re Marriage of Gudenkauf*, 204 N.W.2d 586 (Iowa 1973); *Connolly* v. *Connolly*,  S.D.  (1978) (270 N.W.2d 44 [S.D. 1978]). Cf. *Eule* v. *Eule*, 24 Ill. App. 3d 83 (1974) (waiver of temporary support and alimony pendente lite held void); *Holliday* v. *Holliday*, 358 So. 2d 618 (La. 1978) (waiver of alimony pendente lite held void).

We conclude that we shall follow the reasoning of the *Posner* case and its progeny and uphold the contract. While the matter is not free from dispute, it is apparent that the significant changes in public policy during the last decade in the area of domestic relations warrant a tolerant approach to the use of antenuptial contracts as vehicles for settling the property rights of the parties in the event of divorce. In recent years the Legislature has abolished the doctrine of recrimination and recognized irretrievable breakdown as a ground for divorce. G. L. c. 208, § 1, as appearing in St. 1975, c. 698, § 1. The Legislature itself has thus removed significant obstacles to unhappy couples wishing to obtain a divorce. There is no reason not to allow persons about to enter into a marriage the freedom to settle their rights in the event their marriage should prove unsuccessful, and thus remove a potential obstacle to their divorce. We therefore hold that an antenuptial contract settling the alimony or property rights of the parties upon divorce is not per se against public policy and may be specifically enforced. We express no opinion on the validity of antenuptial contracts that purport to limit the duty of each spouse to support the other during the marriage.

*Legal Limitations upon Antenuptial Agreements.*

We note that the freedom of the parties to limit or waive their legal rights in the event of a divorce is not appropriately left unrestricted. We therefore set forth some guidelines to be used in determining the extent to which such agreements should be enforced, observing at the same time that none of these comments are relevant or applicable to the decision in the case before us. At the outset, the validity of such agreements should be judged by the same "fair disclosure" rules set forth by this court in *Rosenberg* v. *Lipnick,* 377 Mass. 666 (1979). Consistent with our holding in *Rosenberg,* those rules should be applied prospectively from the date of our decision in that case. In addition, antenuptial agreements that settle the alimony and property rights of the parties in the event of a divorce should be binding on the courts to the same extent as postnuptial separation agreements. The public policies that underlie the laws regulating separation agreements are equally applicable whether the agreement is entered into before the marriage or after the marriage and in expectation of separation or divorce. Accordingly, the agreement must be fair and reasonable at the time of entry of the judgment nisi, and it may be modified by the courts in certain situations, for example, where it is determined that one spouse is or will become a public charge, or where a provision affecting the right of custody of a minor child is not in the best interests of the child. See generally *Knox* v. *Remick,* 371 Mass. 433 (1976).[7] See also Restatement (Second) of Contracts § 191 (1981). In any case where the issue is whether payment shall be ordered in excess of that provided in the agreement, the agreement can be raised as a potential bar in the same proceeding. *Knox* v. *Remick, supra* at 436. Finally, we recognize that certain contracts may so unreasonably encourage divorce as to be unenforceable on grounds of public policy. See Restatement (Second) of Contracts § 190 (1981).

---

[7] See also *Unander* v. *Unander,* 265 Or. 102, 107 (1973), holding that the antenuptial agreement will be enforceable unless the spouse is deprived of support she cannot otherwise secure.

*After-acquired Property.*

David argues that even if the antenuptial agreement is not contrary to public policy, it is ineffective as to property acquired after the parties were married. His argument is based on the language of G. L. c. 209, § 25: "At any time before marriage, the parties may make a written contract providing that, after the marriage is solemnized, the whole or any designated part of the real or personal property or any right of action, of which either party may be seized or possessed at the time of the marriage, shall remain or become the property of the husband or wife, according to the terms of the contract." David contends that the words "at the time of the marriage" prohibit the application of the terms of the antenuptial contract to after-acquired property. However, this statute, enacted in 1845 (St. 1845, c. 208, § 1), was designed to abrogate the old common law doctrine that precluded a man and a woman from entering into an enforceable contract with each other to be performed during their subsequent marriage. *Welch* v. *King,* 279 Mass. 445, 448 (1932). See *Miller* v. *Goodwin,* 8 Gray 542 (1857); *Gibson* v. *Gibson,* 15 Mass. 106, 111 (1818); 1 W. Blackstone, Commentaries 430 (1765). It does not affect the rights of the parties to determine their property rights upon termination of the marriage. *Jenkins* v. *Holt,* 109 Mass. 261 (1872). See *Freeland* v. *Freeland,* 128 Mass. 509, 510 (1880). For this reason, *Welch* v. *King, supra,* cited by David, has no bearing on the instant case inasmuch as that case involved an antenuptial contract purporting to regulate the property rights of the parties during the marriage. General Laws c. 209, § 25, therefore, does not preclude the parties from determining in advance of the marriage their rights with respect to property acquired during the marriage. We see no reason to impose such a restriction ourselves, and we therefore decline to do so.

*Duress.*

David alleges that the antenuptial contract is invalid because it was entered into under duress.[8] David saw the con-

---

[8] There is no claim of fraud here, since David was fully aware of the extent and nature of Barbara's assets. A full schedule of Barbara's property

tract for the first time a few hours before the wedding cere-
mony when it was presented to him by Barbara's attorney
for signing.   However, the master whose report was adopt-
ed by the Probate Court found that on several occasions
before the marriage Barbara had told David that she in-
tended to have her money pass to her legitimate descendants
and their descendants.   The master also found that at some
point after their engagement and before the wedding they
had discussed the antenuptial agreement.   The master con-
cluded that the husband had entered into the agreement "of
his own free will . . . without any fraud, coercion, undue
influence or duress."   On review of the record, we conclude
that there was ample evidence to support the master's find-
ings and that they are therefore not clearly erroneous. See
*Chase* v. *Pevear*, 383 Mass. 350, 359-360 (1981); *Selectmen
of Hatfield* v. *Garvey*, 362 Mass. 821, 825 (1973).
*Alleged Gifts of Real Estate.*

David argues that, with respect to three parcels of real
estate acquired during the marriage in the joint names of
David and Barbara, a gift was made by Barbara to David of
a one-half interest in each of the properties.   In his general
findings the master found that despite the fact that legal
title to the properties was in David and Barbara jointly, the
presumption of joint ownership had nevertheless been re-
butted by other evidence, and that no ownership interest
had been created in David.   The probate judge struck these
general findings with respect to each of the properties, con-
cluding that David owned a one-half interest in each of the
properties.

The master's findings of fact are binding on the probate
judge and on this court unless "mutually inconsistent, con-
tradictory, plainly wrong or vitiated in view of the control-
ling law."   *Chase* v. *Pevear, supra* at 359.   With respect to
the master's ultimate conclusions, however, "[w]e must apply
our own view of the law, and we must consider whether the
master's general findings, on a correct view of the law, are
consistent with his subsidiary findings." *Id.* at 359-360. See *Jet*

was attached to the antenuptial contract and was read by David before he
signed it.

*Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 164-165 n.7 (1979); Mass. R. Civ. P. 53 (e) (2), 365 Mass. 817 (1974).[9]

The contract in this case does not prohibit the parties from making gifts to each other during the marriage. See *Whitney* v. *Buck*, 3 Mass. App. Ct. 766 (1975). It is settled law that where one spouse purchases property entirely with his or her own funds and takes title in the names of both spouses jointly, a rebuttable presumption arises that a gift was intended to the other spouse of a one-half interest in the property. *Goldman* v. *Finkel*, 341 Mass. 492 (1960). *McPherson* v. *McPherson*, 337 Mass. 611 (1958). See *Krasner* v. *Krasner*, 362 Mass. 186 (1972). This is the rule whether the person who pays the purchase price is the husband or the wife. *Ross* v. *Ross*, 2 Mass. App. Ct. 502, 508 (1974), and cases cited.[10] However, this presumption operates "only in the absence of countervailing or rebutting factors." *Robinson* v. *Robinson*, 366 Mass. 582, 586 (1974). The goal, then, is to determine, upon the totality of the facts, whether

[9] The first sentence of Rule 53 (e) (2) of the Massachusetts Rules of Civil Procedure states that in a nonjury action "the court shall accept the master's findings of fact unless clearly erroneous." It is noted, however, that the corresponding rule of domestic relations procedure omits this sentence, but otherwise is exactly the same. Mass. R. Dom. Rel. P. 53 (e) (2) (1975). With respect to this deletion, the comment accompanying the rule states only that "Rule 53 (e) has been amended by deleting sub-section 3 (jury actions) and reference to jury actions in sub-section 2." Mass. R. Dom. Rel. P. 53 (e) (2), Comment (1975). Since the comment contains an obvious error (it was reference to nonjury actions that was deleted), and because there is no logical reason for creating a new standard of review of masters' findings in domestic relations cases, it is believed that the deletion of the sentence is a technical error, at least in so far as it may have any effect on the "clearly erroneous" standard of review that is generally applicable to masters' findings. Domestic relations cases before the effective date of the civil rules used the "clearly erroneous" standard. See, e.g., *Blanchette* v. *Blanchette*, 362 Mass. 518, 521 (1972); *Minot* v. *Minot*, 319 Mass. 253, 262-263 (1946).

[10] In many States the presumption of gift does not operate when it is the wife who pays the purchase price. See generally Comment, Husband's Acquisition of Title with Funds Furnished by Wife: Resulting Trust or Presumption of Gift, 74 Dick. L. Rev. 455 (1970). Massachusetts does not adhere to this view. See *Ross* v. *Ross*, 2 Mass. App. Ct. 502, 508 (1974), and cases cited.

or not the person who paid the consideration ever intended to make a gift to the other spouse. *Id.*

Two of the properties in which David claims an interest are vacation homes. One is a ski lodge in Vail, Colorado, originally owned by Barbara's father. During the marriage it was purchased by Barbara from her father's estate for approximately $45,000 from her separate funds. The other is a summer home in North Haven, Maine, which was given to Barbara by her grandmother. In other respects the facts relative to the two separate properties are very similar and we therefore treat them together. Although title to both properties was put in their names jointly, Barbara did not tell David that his name was on either deed. She did not file any gift tax return. David acknowledged in his testimony that during the marriage he always regarded both properties as belonging solely to his wife. Barbara paid all real estate taxes, insurance and maintenance expenses, and the rental income from the properties was either paid into Barbara's trust account (in the case of the Maine property) or was regarded by both David and Barbara as belonging to Barbara (in the case of the Colorado property). Given these facts, we cannot conclude that the general findings of the master regarding these properties were erroneous.

The question is more difficult with respect to the residence in Brookline, Massachusetts. For this reason we set forth all the findings of the master in full: "This property was purchased on March 26, 1970, for $76,000, entirely from Barbara's trust funds. The deed from the seller ran to David and Barbara, as tenants by the entirety. Renovations costing $35,000 were financed by a mortgage which was paid off in full from Barbara's trust funds. David never contributed any funds whatever to the acquisition, maintenance or other expenses of this property. Barbara, David and their children occupied this residence until Barbara and David separated. After the separation, David returned his key to Barbara, and Barbara and the children continued to occupy that house until they moved to Texas in June of 1975. The property was sold in 1976. The net sale proceeds

have been escrowed in an interest bearing account, to be distributed in accordance with the decision in the equity case. All real estate taxes, insurance premiums, maintenance and all other costs pertaining to the ownership, maintenance and sale of the house, both before the separation and after, were paid from Barbara's trust funds. Barbara never intended to make any gift of any interest in the house to David, either when the house was purchased, or when title was taken, despite the language of the deed, or at any time thereafter. David acknowledged that Barbara did not intend any gift to him after separation, when she paid off the $35,000 loan, or when she paid the real estate taxes, insurance, maintenance and other property-related costs. I find that Barbara was the sole owner of the Crafts Road residence and has rebutted any presumption which might exist in favor of David having had an ownership interest therein."

There are several factors which set the Brookline residence apart from the other properties. First, David did not acknowledge that during the marriage he regarded the property as belonging to Barbara. We interpret the master's report as referring only to David's acknowledgement that after the separation, when Barbara paid off the various expenses associated with the property, she did not intend her payments of these expenses to be gifts to David. Second, we infer that during the marriage David knew his name was on the deed. Finally, the property was bought for use as their principal residence. We think that, in the face of joint title, the facts found by the master make it best a thin case upon which to support his finding that no gift was intended. This is so even when we consider all the evidence in the record that might support his conclusion. Nevertheless, in light of the entire record we are persuaded that the master's finding is not clearly erroneous. His finding regarding the Brookline property is consistent with the antenuptial agreement and with the apparent relationship between the parties throughout the marriage as to all of their separate property. His finding is also consistent with his findings concerning all other property acquired by Bar-

bara during the marriage. Although the question is a close one, we think that the record as a whole supports the master's finding.

*Alleged Gifts of Art Objects.*

David claims an ownership interest in seventeen works of art which were purchased during the marriage. With possible exceptions noted below, all of the art was purchased with funds coming directly from Barbara's sole trust or fiduciary accounts. The master found that while David accompanied and advised Barbara in purchasing the works of art, "in every case the decision to purchase — 'to spend the money, write the check' — was Barbara's." When David and Barbara separated, David took one painting which Barbara has given him; he did not take or seek to take any of the other works of art. In support of his claim David points out that some of the vendors billed these purchases to David and Barbara jointly. However, the master found that Barbara had nothing to do with how the invoices were made out. Therefore, they have no bearing on Barbara's intent. David also states that the art was listed as joint property on a report prepared by their financial advisors. The master made no findings concerning this report, and the record discloses conflicting testimony regarding whether Barbara ever saw it. In light of this we find David's argument to be without merit.[11]

With respect to seven of the works of art, the master found that these were purchased from Barbara's trust funds "directly or through the Barbara and David joint accounts." The record indicates that neither David nor Barbara could recall which, if any, of these were purchased with funds from the joint account. If it had been established that certain of these works of art had been paid for out of the joint accounts, then there might be some basis for finding a presumption in favor of joint ownership, since the purchase

---

[11] David also states that the parties' insurance policy listed the art as joint property. The master made no findings on this point. David's brief does not indicate where in the voluminous record this evidence appears, and our own search of the record has failed to find anything. We therefore do not consider it.

money itself would be presumed to be jointly owned. *Ross v. Ross*, 2 Mass. App. Ct. 502, 511 (1974). *D'Amico* v. *D'Amico*, 1 Mass. App. Ct. 561 (1973). Absent such evidence, however, the husband has failed to prove any ownership interest in the works of art. There was no error as to the art objects.

*Other Personal Property.*

It is felt that the findings of the master, as adopted by the Probate Court, regarding the remaining items claimed by the husband are not erroneous. No purpose would be served in relating the details surrounding the acquisition of these pieces of property. Suffice it to say that a review of the record indicates that the findings were amply supported by the evidence.

*Evidence.*

David also argues that certain irrelevant evidence concerning his postseparation life-style was erroneously admitted by the master. We dispose of this contention by observing that, even if the evidence was improperly admitted, it has not been shown that the master was influenced by it, at least to the extent that exclusion of the evidence might have changed the outcome. *Ferris* v. *Turner*, 320 Mass. 555, 558 (1947).[12]

The judgments of the Probate Court are reversed in so far as they entitle the husband to any ownership interest or share of the three parcels of real property. All other aspects of the judgments are affirmed. The cases are remanded to the Probate Court for entry of judgments in accordance with this opinion.

*So ordered.*

---

[12] It has come to the attention of the court that counsel for David (however, not the attorney who argued this appeal for David) entered into a fee arrangement with David that was contingent in nature and which provided for a substantial penalty in the event David and Barbara were reconciled. At a point not late in the proceedings counsel voluntarily rescinded the agreement. We note that contingent fee agreements are expressly prohibited in divorce cases by the rules of this court. See S.J.C. Rule 3:05 (3), 382 Mass. 762 (1981), formerly S.J.C. Rule 3:14 (3). In addition, the court takes an especially dim view of any penalty clause that discourages reconciliation, as such a provision is manifestly contrary to public policy.