In re Lewis J. BUSCONI, Debtor.

Elaine J. VAUDREUIL, Plaintiff,

v.

Lewis J. BUSCONI, Defendant.

Bankruptcy No. 91–40290–JFQ.
Adv. No. 91–4142.

United States Bankruptcy Court,
D. Massachusetts.

May 12, 1992.

Susanne R. Blatt, Cosgrove, O'Connell & Blatt, Worcester, Mass., for Elaine Vaudreuil/plaintiff.

Bruce F. Smith, Jager, Smith, Stetler & Arata, Boston, Mass., for Lewis Busconi/defendant/debtor.

Carl Aframe, Worcester, Mass., for Creditors' Committee.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

Elaine J. Vaudreuil (the "Plaintiff") is the former wife of Lewis J. Busconi (the "Debtor"), who is a chapter 11 debtor here. She seeks a judgment which declares nondischargeable the Debtor's obligation to make weekly payments to her in the sum of $1,096.08 and to pay her health insurance, hospital bills and counsel fees. Both parties move for summary judgment. Set forth here are my findings of fact and conclusions of law.

## I. FACTS

I draw the facts from uncontradicted statements contained in the parties' affidavits and from the judge's findings in their contested divorce case. At the time of the divorce in 1990, the Debtor owned and operated through various entities 800 apartment units, five large commercial buildings, five hotels, a country club, a plumbing business and numerous parcels of raw land suitable for development. The Plaintiff was also involved in the real estate business. She operated her own brokerage business and owned buildings containing forty apartment units.

The Debtor is sixty-four years old and the Plaintiff is forty-seven. They first met in 1975 shortly after their prior marriages had been dissolved by divorce. Soon thereafter, the Debtor moved into the Plaintiff's home. In 1976, that home was sold as part of the Plaintiff's settlement with her first husband. The Debtor then purchased a home in Southboro where the parties thereafter lived with the Plaintiff's two minor children. Although the Plaintiff had the ability to support herself and her children, the Debtor provided the entire support for the household.

In 1980, the parties separated for awhile, due in part to the Plaintiff's desire that they marry and the Debtor's indecision on the subject. Shortly thereafter, they agreed to marry and the Debtor decided to adopt the Plaintiff's two children. The Debtor told the Plaintiff that he would not marry her without a prenuptial agreement which sets forth their rights in the event of divorce. He did not want a divorce to precipitate the sale or liquidation of his real estate holdings. The Plaintiff was amenable to this provided that she receive the Southboro home, some cash and regular payments for the rest of her life. The Debtor believed that installment payments would be tax-deductible to him if they were

described as alimony, and he saw this as an additional advantage to the arrangement.

The parties signed a prenuptial agreement on May 9, 1981 and were married the following day. The agreement was drafted by the Debtor's lawyer and first seen by the Plaintiff when she signed it. Although each party was then generally aware of the assets of the other, neither knew each other's income or expenses. The prenuptial agreement spelled out the rights of the parties in the event of divorce. The Plaintiff was to receive $250,000 in cash and title to the Southboro property, with its furniture and fixtures, mortgage-free. The property was then worth about $750,000. The Plaintiff was also to receive "as alimony" monthly installments at the annual rate of $40,000 per year, subject to adjustment upward in future years based upon the consumer price index. These payments were to continue even if the Plaintiff remarried. In return, the Plaintiff agreed not to seek any additional property or payments from the Debtor. The Debtor was then a wealthy man owning many of the business interests referred to above. The Plaintiff then owned thirty-one apartment units. The figure of $40,000 was negotiated by the parties without any reference to specific needs of the Plaintiff.

The parties resided at the Southboro home during their marriage. The Debtor expanded his various business interests during the ensuring years. The Plaintiff worked full-time at her real estate brokerage business, and this also prospered. Her residential real estate investment holdings increased from thirty-one to forty apartment units. They employed domestic help, including a cook. They traveled and spent many weekends at the Plaintiff's vacation home on Cape Cod. The Debtor continued to provide the entire support for the household.

Marital difficulties developed after a few years and the Plaintiff filed for divorce on September 16, 1987. In the divorce proceeding, she launched an attack on the prenuptial agreement. She contended that it should be disregarded for insufficient disclosure of assets by the Debtor, absence of her representation by counsel, and coercion by the Debtor. Judge Arlene S. Rotman of the Probate Court found that the agreement was fair and reasonable at the time of its execution and continued to be fair and reasonable at the time of the divorce. The judge issued detailed findings of fact and conclusions of law. Judge Rotman found that for calendar year 1988, the Plaintiff had received $266,165 in rent from her properties and deducted $55,726 in depreciation. The judge was unable to determine the Plaintiff's current net income, stating that the "plaintiff claims that her real estate company operated at a slight profit but she had no substantiating documentation." The judge did find that the Plaintiff's real estate business was in decline because of the economy and that the number of salespersons working for her had decreased from five to three. She also found the Plaintiff to be in good health. The judge made no independent findings concerning the Plaintiff's support needs and, as discussed below, she was careful to distinguish her function in approving the agreement from the role she would perform in its absence.

A decree of divorce issued on June 11, 1990. Incorporating the prenuptial agreement, Judge Rotman ordered a cash payment of $250,000 and the transfer of the Southboro property free of all taxes and mortgages. She also ordered the Debtor to pay the Plaintiff "as alimony" $1,096.08 per week, which was the adjusted version of the $40,000 annual obligation contained in the prenuptial agreement. In conformity with the terms of the prenuptial agreement, the judge ordered these payments to continue despite the Plaintiff's remarriage and to terminate only upon the death of either of the parties. The judge also imposed obligations upon the Debtor not contained in the prenuptial agreement—maintenance of medical insurance for the Plaintiff until the remarriage of either and payment of certain of the Plaintiff's medical bills and repair expenses. Thereafter, the Debtor transferred the Southboro home to the Plaintiff. He had difficulty raising the $250,000 cash payment, but finally paid the balance due after contempt proceedings

which resulted in an award of attorney's fees.

Beset by the woes of the current real estate market, the Debtor filed a chapter 11 petition here on February 7, 1991. In July of 1991, he stopped making the weekly payments. The creditors moved for a reduction of the salary he was drawing from his various enterprises, and I reduced it from approximately $370,000 per year to $75,000. The Debtor then sought a reduction in his weekly payments to both the Plaintiff and his first wife. (The dissolution of his previous marriage of many years, from which there were no children, had resulted in an alimony award of $500 per week). After first reducing the Plaintiff's payments, the state court restored them back to $1,096 per week but indicated that the Debtor would not be held in contempt if he paid $480 per week. He is now paying the Plaintiff $480 per week and accruing a liability of $616 per week.

## II. ARE THE WEEKLY PAYMENTS "IN THE NATURE OF ALIMONY, MAINTENANCE, OR SUPPORT" WITHIN THE MEANING OF SECTION 523(a)(5)?

■ Section 523(a)(5) of the Bankruptcy Code excepts from discharge a debt "to a ... former spouse ... for alimony to, maintenance for, or support of such spouse ..., in connection with a ... divorce decree." The label placed upon the debt by the parties or by the court is not conclusive. Section 523(a)(5) further provides that a debt is not excepted from discharge "to the extent that ... such debt includes a liability designated as alimony, maintenance, or support, *unless such liability is actually in the nature of alimony, maintenance, or support.*" (Emphasis added). The statute gives no further guidance. We know from legislative history, however, that "[w]hat constitutes alimony, maintenance, or support, will be determined under the bankruptcy laws, not State laws." H.R.Rep. No. 595, 95th Cong., 1st Sess. 364 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787–5963, 6320; S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5865.

The courts are in general agreement that the phrase "in the nature of alimony, maintenance, or support" simply means support, and that the issue to be resolved in cases such as this is whether the agreement or divorce decree provides for support or a property settlement. *See, e.g., Yeates v. Yeates (In re Yeates),* 807 F.2d 874 (10th Cir.1986); *Williams v. Williams, (In re Williams),* 703 F.2d 1055 (8th Cir.1983); *Melichar v. Ost (In re Melichar),* 661 F.2d 300 (4th Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982); *Daviau v. Daviau (In re Daviau),* 16 B.R. 421 (Bankr.D.Mass.1982). In seeking to determine whether a support obligation exists, some courts have fashioned elaborate lists of factors which include such matters as the intention of the court and the parties, the age, health and work skills of the parties, whether the obligation terminates upon remarriage, the parties' respective financial resources, the duration of the marriage and the parties' standard of living during the marriage. *See, e.g., Stone v. Stone (In re Stone),* 79 B.R. 633 (Bankr. D.Md.1987). Occasionally, fault is included as a factor even though this would seem to be a more appropriate consideration for the state judge to take into account in determining the amount of the award. *See, e.g., Benich v. Benich (In re Benich),* 811 F.2d 943, 945 (5th Cir.1987).

■ The approach of all the courts is essentially the same, whether or not they use numerous factors. They focus on the intent of the parties in making an agreement and the intent of the court in making an award. In doing so, they attempt to get some sense of whether the debtor has an obligation for support and the spouse has a need for support. Yet they recognize that their task is not to apply state law where the parties made an agreement. "Although showing that the debtor owed a duty of support under state law at the time of the divorce may be some evidence that an obligation is in the nature of support under § 523(a)(5), state law cannot control. Rather, the initial inquiry must be to ascertain the intention of the parties at the time they enter into the stipulation or property

settlement agreement." *Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir.1986). If the agreement is ambiguous, extrinsic evidence concerning the spouse's need for support is an important factor in determining the parties' intentions. *Id.*

■ With these principles in mind, I turn to the parties' prenuptial agreement. It contains the phrase "as alimony" but no statements concerning the Plaintiff's support needs. I therefore look to the circumstances surrounding the agreement's execution.

There are numerous indications that these periodic payments represent a property settlement rather than support. The Debtor wished to avoid having a court impose a transfer or liquidation of any significant portion of his extensive real estate interests. He intended the payments to be in lieu of this and to be part of an exchange under which the Plaintiff would waive her rights to his property. Periodic payments which are a substitute for property rights constitute a property obligation and not a support obligation. *Benich v. Benich (In re Benich)*, 811 F.2d 943 (5th Cir.1987). The term "alimony" was used in order to give the Debtor tax deductions. The Plaintiff was not in need of support. She was in good health and self-supporting through her real estate brokerage business and her own investment properties. She was only thirty-six years of age when the agreement was signed in 1981. The Plaintiff and the Debtor arrived at the $40,000 annual figure without any reference to the Plaintiff's income and expenses. Finally, continuation of the payments even after the Plaintiff's remarriage is indicative of a property settlement and not a support obligation.

■ This prenuptial agreement is far different, moreover, from a separation agreement signed at the time of a divorce. In making a separation agreement, the parties are obviously aware of their current needs. But when the Plaintiff and Debtor made their prenuptial agreement, they could have no awareness of their actual needs at the time of the divorce. Indeed, they could not have known whether or when divorce might ensue.

The Plaintiff relies upon Judge Rotman's finding that the agreement was fair and reasonable at the time of the divorce. But Judge Rotman was quite clear concerning her standard of review. She said: "The standard of review at this stage of the hearing is to determine if there has been an unforeseen change of circumstance since the execution of the agreement which would render enforcement of the agreement unconscionable under the present circumstances.... It is not the function of the 'second look' to hold a hearing pursuant to G.L. c. 208, § 34 to determine alimony and an equitable division of property. If that were the requirement, there would be no point in ever entering into an antenuptial agreement. Unless the Court finds the agreement not to be fair and reasonable at this time under the standard set-out herein, the c. 208, Sec. 34 waiver is deemed effective."

Judge Rotman was clearly correct in declining to determine alimony and property rights under section 34. In *Osborne v. Osborne*, 384 Mass. 591, 428 N.E.2d 810 (1981), the court held that although such agreements are not per se against public policy they must be the result of fair disclosure at the time of execution and must be fair and reasonable at the time of divorce. Most important for our purposes, the court made it clear that if the agreement passes these standards there is no occasion for the probate judge to make the findings required for an alimony award and a division of property.

■ We are therefore not aided by findings and conclusions of the probate court supporting what it determines to be an equitable award of alimony or property in light of the parties' circumstances at the time of the divorce. Judge Rotman merely enforced the parties' agreement made nine years before. Had she made such findings and conclusions, they would have been a great help in determining the nature of the award.[1] The intent of the state court to

---

**1.** It should nevertheless be noted that under      section 34 the probate court has the power to

make an award for support purposes is most significant in determining the nature of the award, particularly in light of principles of comity. *E.g., Catlett v. Jackson (In re Jackson),* 48 B.R. 616 (Bankr.W.D.Ky. 1985).

It is unnecessary to deal with the Debtor's alternative contention, based upon *Calhoun v. Calhoun (In re Calhoun),* 715 F.2d 1103 (6th Cir.1983), that I should discharge at least so much of the weekly payment which exceeds the Debtor's present ability to pay. I do note that *Calhoun* has been rejected by other courts of appeal on the ground that it is the federal court's duty to determine the nature of the obligation and not to modify it. *E.g., Sylvester v. Sylvester,* 865 F.2d 1164 (10th Cir.1989); *Forsdick v. Turgeon,* 812 F.2d 801 (2d Cir.1987); *Draper v. Draper,* 790 F.2d 52 (8th Cir.1986); *Harrell v. Sharp (In re Harrell),* 754 F.2d 902 (11th Cir. 1985). *See* Sheryl L. Scheible, *Bankruptcy and the Modification of Support: Fresh Start, Head Start or False Start?,* 69 N.C. L.Rev. 577 (1991).

### III. THE AGREEMENT'S OBLIGATIONS CONCERNING ATTORNEY FEES, HOSPITAL BILLS AND HEALTH INSURANCE

█ The remaining questions may be quickly dispatched. The Debtor does not dispute that his obligations concerning health insurance and hospital bills are not dischargeable. The Debtor's obligation to pay the Plaintiff's counsel fees is clearly dischargeable because the underlying services were rendered in enforcing his obligation to make the $250,000 payment and transfer the home. Those were property obligations.

A separate judgment has previously issued declaring nondischargeable only the Debtor's obligation concerning health insurance and hospital bills.

order property transfers for the purpose of providing support, so that the true nature of the award always has to be carefully examined.

*See Daviau v. Daviau (In re Daviau),* 16 B.R. 421, 424 (Bankr.D.Mass.1982).