656 So.2d 1143 (1995)
Billy W. SMITH
v.
Zena Faye Phillips SMITH.
No. 92-CA-01163-SCT.
Supreme Court of Mississippi.
May 11, 1995.
*1144 Duncan L. Lott, Booneville, for appellant.
Joseph C. Langston, Langston Langston Michael & Bowen, Booneville, for appellee.
En banc.

ON PETITION FOR REHEARING
PRATHER, Presiding Justice, for the Court:
We deny this petition for rehearing. The original opinions are withdrawn and these opinions are substituted therefor.

I. INTRODUCTION
Appellant Billy W. Smith (Billy) filed for a divorce and sought enforcement of an antenuptial agreement. He further requested consolidation of the suit with another cause involving his wife's, Zena Faye Phillip Smith's, withdrawal of a portion of the parties' joint savings account. Appellee Zena Smith (Zena) counterclaimed for separate maintenance. The Prentiss County Chancery Court dismissed Billy's complaint for divorce as well as Zena's counterclaim for separate maintenance. The chancellor found Zena was entitled to withdraw money from the couple's joint savings account. All other relief requested by the parties was denied. Neither party has appealed the denial of his/her complaint for divorce or counterclaim for separate maintenance. However, Billy appealed seeking review of the following issues:
A. Whether the court erred in granting to Zena Smith any interest in the couple's joint savings account;
B. Whether the court erred by not implementing the terms and dictates of the antenuptial agreement entered into between the parties as it concerns the division of the parties' property and assets;
C. Whether the court erred by not ordering Zena Smith to refund the monies she received from the Prentiss County Board of Education; and
D. Whether the court erred by not adjudicating the parties' interest or claims to all property prayed for by the parties.

*1145 II. FACTS

Both parties in this proceeding had previous marriages and children by their former spouses. In contemplation of their marriage, they entered into an antenuptial agreement on April 6, 1985, agreeing that both parties would have "full, complete and absolute control and management of all [his/her] property" by "sale, inter vivos gift ... so that all of [his/her] said property shall be disposed of as [s(he)] alone desires." Each party relinquished any claims to each other's non-marital assets brought into the marriage. Zena testified that the attorney, employed by her husband to prepare the antenuptial agreement, interpreted the agreement to mean that Billy got what was his when they married and she retained what was hers when they married, but that what was accumulated after the marriage would be jointly owned.
The parties married on April 27, 1985. At the time of the marriage, Zena Smith had a home with four acres of land which she sold for $45,000.00. She received a down payment of $10,000.00, and a monthly payment of $430.00 per month over a 15 year period. She had an outstanding debt against that home for $10,000.00 which she paid by applying $5,000.00 of the down payment and borrowing $5,000.00 from her husband. She repaid her husband the loan of $5,000.00 from the monthly payment. She moved into Billy Smith's home and helped him remodel it.
Zena also had a 1982 Chevrolet Monte Carlo automobile. Billy had a 1979 Oldsmobile, a pick-up truck, and several acres of real estate. Zena permitted Billy to sell her 1982 car, although she did not want to do so, and from the net proceeds of the sale she bought Billy's old 1979 Oldsmobile for $3,500.00, which was the same price he had paid for it three years earlier. Billy then bought a 1988 Buick which he referred to as "her" car, but titled it in both their names.
Zena bought ten acres of land from Billy and was paying for it at the rate of $500.00 per month. She purchased a double-wide mobile home "for resale" from Peoples Bank for $27,384.59 (including attorney fees, appraisal, and finance charges), secured by a first deed of trust on a 1.7 acre lot, also purchased from Billy. Billy signed this bank note with her as co-signee with a one time payment, due on May 25, 1991.
Zena held a full time job with a garment plant where she had worked for 40 years. Prior to her marriage, she held two part-time jobs as well; after the parties separated she held a second part-time job. While married, she helped Billy with his truck farming and sold vegetables from her vehicle at work. She helped Billy with personal care of two elderly relatives. From time to time, Billy's daughter and grandchild would live with the Smiths temporarily when marital difficulties of the daughter occurred.
Zena added Billy to her health insurance plan with her employer at a cost of $100.00 per month, which she paid. At one time when she was "laid off" at work, she asked Billy to let her deduct $100.00 per month from her $500.00 payment to him for the real estate purchase; he refused. For lack of money, she dropped his health insurance coverage at her employment.
Billy had a joint savings account, consisting of non-marital funds, with Zena authorized to withdraw funds. He had on occasion instructed her to withdraw monies from this account and honored the withdrawal by her without dispute of her authorization.
Billy's daughter and grandchild moved into the marital home when the daughter decided to permanently separate from her husband. Zena was not told that their home was also to be the daughter's home until after the fact. According to Zena, Billy began to curse her and yell at her. He isolated himself from her and she thought he and his daughter talked against her privately. This conduct caused her to become extremely nervous and upset and when an altercation occurred, she determined that she had to separate from the tense environment. Zena's daughter helped her move. When Billy realized that the only vehicle to be used was a car, he offered and helped Zena move in his pick-up truck. On February 1, 1991, Zena moved into her mobile home on the 1.7 acres of land, but this home lacked water. She lived there over a month, carrying water for personal use.
*1146 Between February 19 and February 22, 1991, after their separation, Zena withdrew $38,500.00 from the joint savings account and $250.00 from a checking account titled in the name of Mr. and Mrs. Billy W. Smith, originally established for Billy and his first wife. Zena used the money to pay attorney's fees and to make payments to her husband under their agreement. Zena also bought another mobile home, for nearly $7,000.00, in which to live. Zena sold this mobile home later, using the proceeds to run water lines into the double-wide mobile home located on the 1.7 acres of land, to install electricity in that mobile home, and to pay interest payments on the 1.7 acres of land in satisfaction of a deed of trust to Peoples Bank.
In May 1991, the $27,000.00 note was due at Peoples Bank, and Zena tried to get an extension of time within which to pay it. The bank was willing if Billy would sign a new note, which he refused to do. The bank began foreclosure proceedings on the deed of trust. Billy asked a friend to bid on the property, seeking to protect himself from a deficiency judgment. Billy loaned the money to the friend to buy the property. Peoples Bank foreclosed on the 1.7 acres of land and the mobile home. A deficiency judgment of $2,353.80 was later entered in circuit court.
Zena was evicted from the mobile home. Billy received title to the foreclosed property with mobile home from his friend about two months later. Billy filed a complaint for a temporary restraining order (TRO) in the Prentiss County Chancery Court in Cause No. 16,807. Another chancellor of the district heard the request and issued a TRO ordering Zena to redeposit all $38,750.00 in the joint account; Zena redeposited approximately $32,500.00, having spent part of this money in the means stated above.
Billy then filed the instant case for a divorce on grounds of habitual cruel and inhuman treatment. Facts alleged to support the grounds were cancellation of health insurance and withdrawal of the funds from the joint account by Zena. Billy also asked for consolidation of this suit with the TRO case. There was no consolidation of the two cases, nor any disposition noted in this record of the TRO suit. Zena counterclaimed for separate maintenance; she was working again at her garment plant job. At the time of the trial for this divorce, in 1991, Billy was 64 years old while Zena was 61.
The chancellor's "Opinion and Judgment of the Court" dismissed Billy's complaint for divorce as well as Zena's counterclaim for separate maintenance. However, the chancellor "awarded" Zena $32,500.00 from the couple's joint savings account, reversing the effect of the previous TRO. "All other relief requested by either party [was] denied."
Billy moved for new trial or, in the alternative, to set aside judgment, but such relief was denied. Billy also requested that the chancellor make specific findings of fact regarding the allocation of an interest in the joint savings account to Zena. The chancellor found that: Zena was "entitled to withdraw the $32,500.00" from the joint savings account; the monies deposited in the account were derived solely from Billy's inheritance or from monies he held prior to his marriage to Zena; Billy had not made a gift of these funds to Zena, but had "placed the funds in a joint account to enable Zena to write checks on the account."

III. OVERVIEW OF ANTENUPTIAL CONTRACTS
In earlier times in many jurisdictions, antenuptial contracts were considered void as against public policy. Such contracts were considered incompatible with the marriage contract and tended to provide inducements to end a marriage. Osborne v. Osborne, 384 Mass. 591, 428 N.E.2d 810, 814 (1981) (citing 2 A. Linday, Separation Agreements and Antenuptial Contracts, § 90, at 90-33 (Supp. 1981)). The Florida case of Posner v. Posner, 233 So.2d 381 (Fla. 1970), began a trend departing from the traditional view and held that such agreements were not void ab initio and rejected the assumptions that such contracts encouraged divorce. In Frey v. Frey, 298 Md. 552, 471 A.2d 705, 709 (1984), the Maryland Court recognized that the majority of courts over the country had abandoned the view that antenuptial contract were void ab initio.
*1147 This Court has followed the majority view and held in Stevenson v. Renardet, 83 Miss. 392, 400, 35 So. 576, 577 (1904), that an antenuptial contract is enforceable like any other contract. However, this Court imposed the requirement of fairness in the execution of such contracts. Estate of Fred Hensley v. Estate of Hazel O. Hensley, 524 So.2d 325, 327 (Miss. 1988). This restriction on enforceability encompassed a duty of disclosure. Hensley at 328; Matter of Estate of Benker, 416 Mich. 681, 331 N.W.2d 193, 196 (1982) (citing F.G. Madoray, Setting Aside Antenuptial Agreement Based on Non-Disclosure, 27 A.L.R.2d 883, 886 (1953)).
Under the above conditions, an antenuptial contract is enforceable as any other contract. Hensley, 524 So.2d at 327. Accordingly, the same rules of construction and interpretation apply. Id. The first rule of interpretation of contracts is to follow the intent of the parties. Hensley, 524 So.2d at 327; Newell v. Hinton, 556 So.2d 1037, 1042 (Miss. 1990); Roberts v. Roberts, 381 So.2d 1333, 1335 (Miss. 1980).
In general, an antenuptial agreement is usually enforced at the time of dissolution of the marriage or at the time of death of a party. See e.g. Rinvelt v. Rinvelt, 190 Mich. App. 372, 475 N.W.2d 478, 481-83 (1991) (antenuptial agreements enforceable at death or divorce). However, legal observers recognize that breach of the agreement can give rise to an appropriate remedy. 1 Ann Oldfather, Janice E. Kosel, et al, Valuation and Distribution of Marital Property, § 4.05 at 4-42 (1994 ed.).

IV. LAW AND ANALYSIS

A. Whether the court erred in granting to Zena Smith any interest in the couple's joint savings account.
Where the chancellor denies a divorce, he is without the authority to order a division of property. Gardner v. Gardner, 618 So.2d 108, 115 (Miss. 1993) (citing Thompson v. Thompson, 527 So.2d 617, 623 (Miss. 1988)). See also Miss. Code Ann. § 93-5-23 (Supp. 1993). As the chancellor denied Billy's complaint for divorce as well as Zena's counterclaim for separate maintenance, he was without the authority to order any division of the couple's property. Thompson v. Thompson, 527 So.2d 617, 623 (Miss. 1988). However, the chancellor was correct, regarding the joint savings account, that Billy had given Zena the authority to write checks or withdraw funds from the account by placing Zena's name on the account. The chancellor did not grant any interest in the joint account; to the contrary, the chancellor only held that Billy granted the withdrawal right to Zena by establishing the joint account. Zena had authority to write checks on the joint account created by her husband. Consequently, Zena was acting within her authority in withdrawing the $38,750.00 from the joint account. More importantly, the chancellor did not grant a divorce, thereby precluding any division of present marital property acquired since the parties' marriage. Therefore, his decree was proper. Accordingly, this Court affirms.

B. Whether the court erred by not implementing the terms and dictates of the antenuptial agreement entered into between the parties as it concerns the division of the parties' property and assets.

C. Whether the court erred by not ordering Zena Smith to refund the monies she received from the Prentiss County Board of Education.

D. Whether the court erred by not adjudicating the parties' interest or claims to all property prayed for by the parties.
Issues B through D pertain to the division of property pursuant to the parties' antenuptial agreement. Since no divorce was granted, the chancellor was without the authority to order any division of property. Gardner, 618 So.2d at 115. However, this is not to imply that the chancery court cannot address the enforcement of the antenuptial agreement at the time of dissolution of the marriage. The trial court may then consider the contract itself and testimony concerning factors of gifts, interspousal transfer of separate property during the marriage, if any, inherited property, the dissipation or appreciation of property, or any other applicable factors to arrive at a fair division of marital assets. *1148 The chancellor was correct in declining to resolve these issues and this Court affirms.

V. CONCLUSION
The chancery court was without the authority to order any division of property between these parties because no divorce was granted. It follows that the chancellor was correct in declining to divide the parties' property or assets. The chancellor was also correct, regarding the joint savings account, that Billy had given Zena the authority to write checks or withdraw funds from the account by placing Zena's name on the account. As we read the record, the order of the trial court "awarding" the $38,750.00 to Zena was not an adjudication that Billy was without an ownership interest but rather a resolution of the injunction issue. That is, Billy was not entitled to have Zena enjoined to return the money even though he may be entitled to establish his interest in the proceeds of the account and establish a debt owing from Zena to him in proceedings brought for that purpose. The Chancellor concluded that Zena did only what Billy empowered her to do. The legal result of that action as between the parties was not decided. It is with this construction that we affirm the order of the chancellor. Therefore, this opinion will only have a res judicata effect on the TRO suit to the extent that we say Billy was not entitled to have Zena enjoined to return the money since she had the right to withdraw from the joint account.
JUDGMENT IS AFFIRMED.
HAWKINS, C.J., and PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J. SULLIVAN and SMITH, JJ., join in result only.
McRAE, Justice, dissenting:
I disagree with the majority's denial of Billy Smith's petition for rehearing. The majority correctly concludes that the chancellor was without authority to order a division of the property because no divorce was granted. Yet it holds that the chancellor was correct in finding that Billy was not entitled to enjoin Zena to repay $32,500.00 to the joint savings account, in essence awarding that money to her. For all practical purposes, this renders the issue collaterally estopped, or at best, res judicata. If the chancellor cannot divide the property, then he cannot make the finding that this Court now affirms. In its denial of the petition for rehearing, which merely pays lip service to the couple's antenuptial agreement, the majority therefore renders Billy's motion for TRO res judicata despite the chancellor's dismissal of the divorce proceedings. Where no divorce has been granted, the chancellor is without authority to make such a disposition. Gardner v. Gardner, 618 So.2d 108, 115 (Miss. 1993); Thompson v. Thompson, 527 So.2d 617, 623 (Miss. 1988). Accordingly, while the majority recites a correct statement of the law, it incorrectly rules to the contrary. I therefore disagree.
The majority adroitly camouflages its affirmation of the "award" to Zena by finding that the chancellor did not grant any ownership interest in the joint account but merely effected "a resolution of the injunction issue." It is of great concern to this writer that the majority, for all practical purposes, affirms the chancellor's $32,500.00 judgment despite his dismissal of the divorce proceedings. In dicta, the majority sends a strong message to the chancellor to affirm the ownership issue before him. Such dicta is unnecessary. A careful review of the record indicates that the chancellor specifically awarded a judgment to Zena Smith in the amount of $32,500.00. In his July 30, 1992 order, the chancellor stated:
THE COURT DOES FIND, AND IT IS HEREBY ORDERED that the savings account at Security Savings Association is a joint account, and the defendant, Zena Faye Phillips Smith, is hereby granted thirty-two thousand, five hundred dollars ($32,500.00) of those sums in that account.
Billy Smith filed a motion on August 4, 1992 seeking specific findings of fact and conclusions of law with regard to his estranged wife's interest in the joint savings account and further, for specific findings of fact regarding "allocation of any interest in said account" to her. The chancellor denied *1149 his motion for a new trial, or in the alternative, to set aside the judgment. In a seemingly contradictory order, he elaborated his findings, stating with regard both to Zena's interest in the account and the $32,500.00 she had withdrawn therefrom:
The Court finds that the defendant, Zena Faye Phillips Smith and the plaintiff, Billy W. Smith held a joint savings account at the Security Savings Association. The Court further finds that since the parties held a joint savings account at the time of the parties' separation that Zena Faye Phillips Smith was entitled to withdraw $32,500.00 from said account. The Court further finds that the monies deposited in said account were derived from plaintiff's inheritance or from monies held by the plaintiff prior to the parties' marriage. The Court further finds that the plaintiff did not make a gift of these monies to the defendant, but rather placed these monies in a joint account in the defendant's and plaintiff's names so as the defendant could write checks on this account.
Where there is substantial credible evidence to the contrary, the presumption may be overcome that joint tenants are presumed to be equal owners of funds jointly titled in their names. Regan v. Regan, 507 So.2d 54, 56 (Miss. 1987). There is substantial credible evidence in the record to support the chancellor's finding that the funds in the Smith's joint savings account were inherited by Billy or were derived from savings he had prior to the marriage. There is further evidence to support the chancellor's finding that Billy had not intended to make a gift to Zena and that the account was titled in both names merely to permit her to write checks for Billy at his direction. Assuming arguendo that division of these funds had been made incident to divorce, Zena therefore would not have been entitled to any part of them. Regan, 507 So.2d at 56. See also, Harrell v. Harrell, 231 So.2d 793, 795-96 (Miss. 1970) (intent of the parties controls when determining ownership of joint account incident to divorce). That such an award was made is not only contrary to the evidence, but also clearly exceeded the chancellor's authority.
While it is true that some antenuptial agreements only govern the disposition of property in the event of a divorce, they still have full force and effect during the marriage especially when containing language such as that in the contract entered into by Billy and Zena Smith. If we continue to recognize antenuptial agreements, shouldn't we also recognize and apply the laws of the state at the time of marriage in determining how the property or assets should be divided? See Valuation and Property, Janet Oldfather, a treatise that the majority writer has once again cited as law.[1]
I object to the majority's suggestion that a chancellor may consider such a contract when dividing marital assets. The appropriate language is that the chancellor shall consider such contracts. As the author of the majority has previously stated, "[a] property settlement is a contractual agreement governed by the law of contracts" and recognized "the freedom to contract and the right of sui juris married adults to enter into a valid and binding agreement regarding their property." Grier v. Grier, 616 So.2d 337, 342 (Miss. 1993) (Prather, J., dissenting). Indeed, this Court has recognized that prenuptial agreements are like any other contract, and when fairly made, are favored by the courts. Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss. 1988); Stevenson v. Renardet, 83 Miss. 392, 35 So. 576 (1904); Gorin v. Gordon, 38 Miss. 205 (1859). The majority should, likewise, seek to protect the sanctity of such contracts between husbands and wives, during marriage and in the event of divorce.
Accordingly, I disagree with the majority's refusal to grant the petition for rehearing.
DAN M. LEE, P.J., joins this opinion. SULLIVAN and SMITH, JJ., join in result only.
NOTES
[1] This writer encourages all litigating attorneys to purchase this $571.00 treatise since it is not currently a common tool in divorce practice in this state, but tends to find its way in every divorce opinion handed down by this Court.