437 So.2d 410 (1983)
James A. TEDFORD
v.
Marie Tedford DEMPSEY.
No. 53871.
Supreme Court of Mississippi.
September 14, 1983.
*414 James D. Waide, III, West Point, for appellant.
J. Tyson Graham, Graham, Segrest & Johnson, Columbus, for appellee.
Before WALKER, P.J., and DAN M. LEE and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This child support modification proceeding raises several questions not heretofore authoritatively answered by this Court. Where future changing circumstances, such as increased expenses of the children, increased earning capacity of the father and mother, coupled with inflation, are at the time of the divorce reasonably forseeable, what is the effect of failure to include provision therefor in the child support provisions of a separation agreement? Where the mother later marries a man of substantial financial means, what effect, if any, does this have on the support obligations, first, of the father, and, second, of the mother?
In the proceedings below, the chancellor held that the increase in children's expenses and father's earnings constituted a material change of circumstances. He ordered the father's child support obligation increased to the point where he is now providing roughly one-half the children's reasonable material needs.
The net effect of the modification decree, of course, is that the mother is responsible for the remainder of the children's needs. She remains so responsible in spite of the fact that she elects not to work. In this way the resources of her new husband have been considered  the mother is free to meet her support obligations from any resources in fact available to her.
The chancellor traversed these and other murky bogs with reasonable success. For the reasons described below, we affirm.

II.

A.
The parties to this seemingly unending domestic dispute are James A. Tedford ("James") and Marie Tedford Dempsey ("Marie"). James and Marie were married to each other on April 20, 1968. Their marriage lasted 11 years. They have two children, namely: Tina Marie Tedford, born August 12, 1970, now thirteen years of age, and Dana Paschal Tedford, born January 14, 1974, now nine years of age.
On March 20, 1979, James and Marie filed in the Chancery Court of Clay County their joint bill for divorce. They cited irreconcilable differences and invoked the procedures found in Miss. Code Ann. § 93-5-2 (Supp. *415 1982). Attached to their joint bill was the required separation agreement. The parties had agreed that Marie would have the custody of the two children and that James would pay $250 per month as child support.
About a month later, and before the agreement had been ratified by the Chancery Court, James lost his job. When he obtained new employment, his take home pay averaged only about $125 per week.[1]
On May 22, 1979, the separation agreement was amended. James' child support obligation was reduced from $250 per month to $150 per month. Two days later, on May 24, 1979, the Chancery Court of Clay County entered its final decree of divorce. That decree incorporated and ratified the amended separation agreement.
Since the entry of the final decree of divorce, a number of changes have occurred in the circumstances of the parties and of the children.[2]
First, some 18 days later, on June 11, 1979, to be specific, Marie married Garland C. Dempsey. She and the two girls moved into a home already owned by Dempsey. The parties acknowledge that Dempsey is a person of some means, although the Chancery Court refused to permit testimony regarding the details of his resources.
Theretofore Marie had been employed as a receptionist with Blazon Flexible Flyers, Inc. (of which Dempsey has been President). Shortly after the divorce and contemporaneous with her marriage to Mr. Dempsey, Marie quit work. It is apparent that she has been living off of the resources provided by her new husband. Her standard of living has increased.
James A. Tedford's circumstances have also changed since the May 24, 1979, divorce. For one thing, James is now earning $10.50 an hour and is bringing home a paycheck in the vicinity of $297 per week. James' net earnings have more than doubled since the divorce and the amended child support agreement. Beyond that, James has taken a new wife. On June 6, 1981, he married the present Mrs. Tedford whose given name is Joanne. James' new wife is employed and brings home approximately $533 per month.
The circumstances of the children have also changed. The amount of money necessary to support them has increased since the May, 1979, divorce. They are older and are engaged in more activities. No one disputes that it costs more to feed, clothe and support children as they grow older. On top of that, the period with which we are here concerned  May of 1979 through October of 1981  is one during which the nation in general and Mississippi in particular experienced double digit inflation. The children's change of circumstances is somewhat muddled by the fact that their school expenses seem to be less. At the time of the divorce in 1979, Tina was attending a private school while Dana was enrolled in a private kindergarten. Both children had enrolled in public schools by the time of the autumn 1981 hearings.
Marie testified without contradiction that in September of 1981 the reasonable monthly expenses of the two children combined was $561.75.[3] In spite of the elimination of private school tuition payments, Marie testified that the expenses of the children have increased overall in the two and a half years since the divorce.

B.
The proceedings below pertinent to the instant appeal took place in two separate hearings. The first hearing was held on September 11, 1981, the second on October 29, 1981. The first hearing primarily concerned Marie's request for an increase in child support. The second concerned certain *416 medical expenses not involved in this appeal.
At the conclusion of the September 11 hearing, the Chancellor ordered James' child support payments increased to $70 per week. This is roughly double the $150 per month James had been paying under the May 24, 1979, divorce decree. In the course of his bench ruling the Chancellor made the following statement:
The Court can and will acknowledge its negligence in that at the granting of the divorce, it did not make sufficient inquiry as to child support. Gentlemen, the amount of child support in this case [the $150 per month] is below the basic requirements promulgated by the State Department of Public Welfare and is inadequate.
The Chancellor then recognized that the standard of living of the two children had improved since Marie's marriage to Garland Dempsey. In this context the Court then correctly stated:
However, that standard of living is not something that can be imputed to the natural father if it is beyond and above his ability. Nor does the fact that the petitioner is not now required to work relieve her of her obligation to contribute to the support and maintenance of the children. From the figures that have been submitted, it is financially impossible for the father to pay an amount in child support equal to what is now demanded for them to be maintained in a standard to which they have become accustomed.
The Chancellor then ordered that James begin making child support payments at the rate of $70 per week beginning October 1, 1981. In so ordering the Chancellor made the following explanation:
It is not to be inferred that the amount of support presently to be awarded is in and of itself adequate, but the present financial circumstances of the father dictate the limitation and any remaining balances may be contributed by the petitioner through her present husband, if she elects not to work and desires to maintain such standards.
The hearing of other issues tendered was then recessed. No final decree was entered at that time
On October 29, 1981, the proceedings resumed. The Court heard evidence concerning medical expenses, hospitalization and medical insurance, and the like  matters which are not involved in this appeal. At the conclusion of that hearing, however, the Chancellor made the following ruling from the bench:
The court, at a previous hearing, had modified the agreement of the parties to require the father to pay to the mother as child support the sum of $70 per week, beginning October 1. At the time of the entry of the separation agreement, the average hourly wage of the father was $5.00 an hour. The father testified that his present hourly wage is $10.50 an hour. The father had originally agreed to pay $150 per month, together with the cost of medical insurance, which has been determined to be $23.12 a month for a total monthly payment of $173.12. He now being relieved of the payment of the payment of medical insurance premiums, his required child support of $70 a week is actually an increase of only slightly more than $50.00 per month per child. The increased earnings of the father being more than doubled since the date of the separation agreement, together with the increased cost of child care, are in the opinion of the Court, justification for the modification as heretofore ordered. The Court is well aware that the father cannot maintain the children in a standard of living as provided by Mr. Dempsey and to which they have now become accustomed; but, nevertheless the amount of child support as now required by the Court of the father is, in the opinion of the Court, commensurate with the father's station in life. [Emphasis added].
Thereafter, the Chancellor on October 29, 1981, entered the final decree from which this appeal has been taken. In pertinent part, this decree recites that:

*417 The Court further finds that there has been a material change in circumstances since the rendition of the earlier decree.
The decree then provided for the increase in James' child support obligation to $70 per week as described above.
James A. Tedford has perfected his appeal from the October 29, 1981, decree. The case has been fully briefed by the parties and the Court has received the benefit of the oral argument of counsel. This appeal is now ripe for a decision.

III.
Four premises need to be stated at the outset  and kept well in mind throughout.
We are first and foremost concerned about the material well being of the two Tedford children, now thirteen and nine years old. The legalistic arguments pro and con marshalled by counsel largely ignore this. All need be reminded that in cases such as this the best interests of the children are as always our touchstone. See Tammen v. Tammen, 289 Minn. 28, 182 N.W.2d 840, 841-842 (1970). In child support modification proceedings, as elsewhere, the chancellor is accorded substantial discretion and is charged to consider all relevant facts and equities, to the end that a decree serving the best interests of the children may be fashioned.
A second, seemingly countervailing consideration arises from felt institutional and societal needs. Matters once finally adjudicated should not be subject to relitigation. There is no such thing as a perfect child support decree, or even an ideal one. All are unsatisfactory, more or less. It is a rare case where both parents fail to feel a financial pinch. Allowing renewed litigation whenever one begins to feel that pinch would hardly be practicable. Conservation of judicial resources and the desire to hold to a tolerable minimum disruptions in post-divorce domestic tranquility have thus given rise to the rule that there may be no modification in a child support decree absent a substantial or material change in the circumstances of one or more of the interested parties: the father, the mother, and the child or children, arising subsequent to the entry of the decree sought to be modified. Bracey v. Bracey, 408 So.2d 1387, 1389 (Miss. 1982); Bunkley and Morse's Amis, Divorce and Separation in Mississippi, § 9.05 (Supp. 1980). This rule is little more than a family law variant of the familiar doctrine of res judicata. Unlike the circumstances which must be shown before child custody will be modified, the "change" here need not be an adverse one.
Third, there is no significance to the fact that we are here concerned with a court ratified child support agreement, made incident to an irreconcilable differences divorce. Miss. Code Ann. § 93-5-2 (Supp. 1982). The rules governing this modification proceeding are the same as if the chancellor had made a support award after a contested divorce trial. Cf. Taylor v. Taylor, 392 So.2d 1145, 1147-1149 (Miss. 1981). When the divorce decree was entered in this case on May 20, 1979, the child support provisions of the separation agreement became incorporated into the decree. They became a part of the decree. They are subject to modification only upon showing of a substantial or material change in circumstances since May 20, 1979.
Fourth, to the extent we are called upon to review findings of fact made by the chancellor, we are constrained by familiar rules. If we find substantial evidence supporting the chancellor's fact findings, they are beyond our power to disturb. Anderson v. Watkins, 208 So.2d 573, 575 (Miss. 1968); Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983); Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983). And, with respect to issues of fact where the chancellor made no specific finding, we proceed on the assumption that the chancellor resolved all such fact issues in favor of appellee, Harris v. Bailey Avenue Park, 202 Miss. 776, 791, 32 So.2d 689, 694 (1947); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983), or at least in a manner consistent with the decree. Again, if there be substantial evidence undergirding such a "presumed finding", we will not disturb it.

*418 IV.
On this appeal, James A. Tedford argues vigorously that the increase in child support was ordered by the Chancellor to compensate for his prior "negligence". At the conclusion of the September 11, 1981, hearing, the trial judge did indeed acknowledge "negligence" in approving a significantly inadequate child support award.
This Court has held that an alimony or child support award cannot be modified solely because the chancellor is convinced that he erred when the original award was made.[4]Shaeffer v. Shaeffer, 370 So.2d 240, 242-243 (Miss. 1979). Were we convinced the basis for the increase in child support was the Chancellor's "realization" that he had approved an inadequate award two and a half years earlier, we would reverse. But this is not what happened.
Counsel seizes upon a single comment made by the Chancellor in his bench ruling following the September 11, 1981, hearing. No final decree was entered following that hearing. Rather, the matter was continued, and at the conclusion of the second hearing on October 29, 1981, the Chancellor stated:
The increased earnings of the father being more than doubled since the date of the separation agreement, together with the increased cost of child care, are in the opinion of the court, justification for the modification as heretofore ordered.
Then in the final decree of October 29, 1981, the Chancellor expressly found that there had been "a material change in circumstances since the rendition of the earlier decree... ."
It is clear to this Court that the bases of the Chancellor's order for an increase in child support were the increase in the expenses of the children[5] and the increase in the father's earnings. The Chancellor found that these constituted a material change in circumstances.
Under our law an increase in children's expenses may be a factor suggesting an increase in child support. A substantial increase in the father's resources may also constitute a material change undergirding an upward modification of child support. Bracey v. Bracey, 408 So.2d 1387, 1389 (Miss. 1982). Inflation since the original decree is also a factor to be considered. McKee v. McKee, 382 So.2d 287, 289 (Miss. 1980); Bracey v. Bracey, supra, 408 So.2d at 1389. On the other hand, slight changes in income or expenses do not constitute a "material change in circumstances". See Keller v. Keller, 230 So.2d 808 (Miss. 1970).
Under the facts and the law, an order for increased child support was appropriate here. Even if it be presumed that the chancellor did in part rely upon his realization that he had been negligent in approving the original child support award, his decree appealed from here reached the right result under the law and the facts.
The chancellor will be affirmed where he reaches a result correct under the law and the facts, even though a wrong reason be assigned. Huffman v. Griffin, 337 So.2d 715, 723 (Miss. 1976).

V.
James argues further that the changes that have occurred are, as a matter of law, not "material" changes because they were known or reasonably to have been anticipated back in May of 1979. He charges that Marie well knew that as the children grew older their expenses would increase, that she certainly knew that inflation would continue to make felt its sting.[6] Most significant *419 in James' mind is his belief that Marie also knew she was going to marry Garland Dempsey once her divorce became final.

A.
James and Marie, like so many couples who divorce, have been at each other's throat almost from the day of the divorce. The usual plethora of contempt petitions have been filed. This is not Marie's first attempt to increase child support. We add this recurring situation to what we have noted above  and what anyone can reasonably anticipate: That children's expenses generally will increase as they get older, that the father and mother's earning capacity will generally increase from year to year, and that inflation will continue at some level and will partially affect both the children's expenses and the parents' earning capacity.
James would have us hold here that, because these things were reasonably forseeable back in May of 1979 and because the separation agreement makes no reference to them, Marie has "waived" the claims she now makes. Surely, that cannot be the law. By the same token, because we "know" these things, we know that the chancery courts of this state will be swamped more than they already are if every increase in the father's salary, every increase in the inflation rate were to generate a modification hearing (where, to be sure, the first question will always be whether the "change" is enough of a change to be classified as a "material change").
Within the contemplation of our law elucidated in the cases cited above  Bracey, McKee, and Keller  there has been a material change of circumstances. The result we affirm here, however, may have been attainable by much more satisfactory means. Had James and Marie included in their separation agreement an escalation clause to provide for increases in children's expenses and parents' earning capacities, the agonies of the instant litigation likely could have been avoided. We cannot undo what has been done. We can and ought, however, speak to the future. In the child support provisions of their separation agreements, the parties generally ought to be required to include escalation clauses[7] tied to the parents' earnings or to the annual inflation rate or to some factored combination of the two. Though under the structure of the irreconcilable differences statute freedom of contract is exalted, there are limits. The statute requires that the chancellor find that "the parties have made adequate and sufficient provision by written agreement for the custody and maintenance of any children ..."[8] Miss. Code Ann. § 93-5-2 (Supp. 1982). The chancellor thus has the power and the responsibility, in the face of the reasonably forseeable, to require some sort of reasonable escalation clause tailored to the situation of the parties.[9] Absent unusual circumstances that *420 might render it inequitable, such a clause ought be in every child support agreement. This practice would have the twin virtues of more adequate and timely support for children and less frequent modification litigation.

B.
James' claim that Marie "knew" she was about to rush into the arms of a wealthy new husband is arguably on a different footing. James suggests to us that Marie was content with $150.00 per month child support because she knew she would have access to Dempsey's financial resources. Having made her deal knowing this, James would have her stuck with it, presumably for good.
The point is without force. We know of no reason in law, morality or common sense why a father's obligation to support his children should be minimized because his ex-wife remarries well.
James' argument overlooks other factors present in this case. In the original separation agreement, James had agreed to pay $250.00 per month. From the record before us, a plausible explanation of the reduction to $150.00 a month was Marie's being reasonable in light of the fact that James lost his job. James would now have Marie stuck with all increases in the children's expenses, real and inflationary, while his obligation would remain fixed at $150.00 a month  and while his weekly take home pay has more than doubled.
The Chancellor made no findings of fact that would guide us here. Under the fourth premise noted in Section III above, we are certainly not going to presume any findings in James' favor. The absence of equity in James' argument is sufficiently apparent that we are hardly surprised that the Chancellor ruled as he did. We decline to disturb his decree.

VI.
The Chancellor's now affirmed finding that there has been a material change in circumstances is only the first step. What  and all  that does is preclude a successful res judicata plea to Marie's application for increased child support.
James argues here, as he did below, that in no event should his child support obligation be increased because the children have now acquired a wealthy stepfather in the person of Garland C. Dempsey, Marie's new husband. James puts his point two ways. Narrowly, he claims error in the Chancellor's refusal to allow him to prove the details of Garland Dempsey's earnings and resources. More generally, he argues that in making his decree for increased child support, the Chancellor failed to consider the children's and Marie's access to Dempsey's resources, concededly substantial even though we don't know the details.
We will consider James' narrow point, and then his general one.

A.
James argues that the Chancellor committed reversible error when he refused to receive into evidence testimony regarding the earnings of Garland Dempsey. What occurred in the trial court on this point we set forth here in full. Marie is being questioned adversely by counsel for James. The following examination takes place:
DIRECT EXAMINATION BY MR. WAIDE
Q Mrs. Dempsey, you earlier testified that you quit work, shortly after your divorce, at Blazon, the company that your husband is president of. Have you sought any other employment since then?

*421 A No, I have not.
Q Has your own standard of living increased or decreased since the time of your divorce?
A Increased.
Q What is your husband's current annual salary by Blazon?
BY MR. GRAHAM:
Your Honor, I'm going to object to that on the grounds that it's irrelevant.
BY THE COURT:
Sustained.
BY MR. WAIDE:
I don't have anything further, Your Honor.
No proffer was made beyond this point.
In our view, the Chancellor committed no error here. Under the facts of this case, neither James' nor Marie's obligation to support the children was affected by Garland Dempsey's earnings. The Chancellor ruled correctly. Dempsey's current annual salary was irrelevant to the issues before the Court.
We note that there was no dispute at trial  nor here  that Garland Dempsey is a person of substantial means. The proof reflects that those means were and are sufficient so that Marie has been able to quit work and at the same time experience an increase in her standard of living.
Second, the Chancellor recognized Mr. Dempsey's resources in two significant and as we hold legally correct ways. First, the Chancellor noted the significant increase in the children's material standard of living. The Chancellor, however, held correctly that James was not responsible for child support beyond a standard of living for the children commensurate with his [James'] means and resources.
Next, the Chancellor correctly refused to attach any significance to the fact that Marie no longer works. He in effect held that Marie nevertheless had an obligation to contribute substantially to the support of the children. It matters not whether Marie fulfills that obligation out of her own resources and earnings or whether she utilizes the resources of her new husband which are obviously in fact available to her.[10]

B.
James' general point is that, in setting the amount of his child support obligation, the fact that the children have acquired a wealthy stepfather should be considered and his (James') support obligation accordingly held at a minimum. The fallacy of his point is apparent. Such may best be explained in the context of a general summary of the legal process by which child support decrees are made.
Both father and mother have an obligation to support their children. This obligation is expressed in legal requirements, *422 moral imperatives, and the psychological and emotional needs children have for tangible expressions of their parents' love. The forms of support demanded go far beyond the material. Our capacity to enforce any other than monetary support as required by law obviously is limited.
When entering a child support decree, the chancellor should consider all circumstances relevant to the needs of the children and the capacities of the parents. The reasonable needs of the children are obviously the beginning point in such inquiry. There is always some minimum level of food, clothing, shelter, day care, education, medical care and the like that must be provided. Above that, what is reasonable turns on the circumstances  and one of the major circumstances is the financial resources reasonably available to each parent.
Where the earning capacity and resources of each parent is such that each is reasonably able to provide for the support of the child or children, each should provide one half of the support.[11] This, of course, will take the form of a decree directing that the non-custodial parent pay to the parent having custody at regular periodic intervals an amount determined to be fair and reasonable under the circumstances. No support decree is entered against the custodial parent. Obviously, if the custodial parent is not providing his or her share of support, the chancellor on proper application may step in.
We recognize that in most cases the father will in fact  and therefore in law  meet well over one-half the children's reasonable financial needs and expenses.[12] That this is so is not a discrimination against fathers. It is no more than a realistic recognition that in our society men still have a far greater earning capacity than do women. Still the rule extends no further than the facts of the particular case. Where the mother has greater earning power or access to greater resources than the father, the situation may well be reversed.
One reality, often overlooked, must be kept well in mind. Whatever the level of support the non-custodial parent is ordered to provide, the parent having custody necessarily provides the rest, monetarily and in kind.[13] The Chancellor's decree recognized this. When that decree is viewed in light of the general premises just stated, it becomes clear that the resources available to Marie upon her remarriage to Garland Dempsey were necessarily considered by the Chancellor and have in fact been utilized to support the children.
The modified child support decree requires that James pay child support of $70 per week. That is $35 per week per child  for daughters now thirteen and nine years old. Little awareness of the world is required to inform one that these amounts won't go far. The remainder of the $561.75, plus the in kind service contributions, must come from Marie. But Marie is not working and has no resources other than her time and child rearing skills. It follows per force that Marie is fulfilling a substantial part of her support obligation through her new husband's resources. And if more than $561.75 per month is in fact being spent on the children, this enhanced material standard of living is being provided wholly through Marie ex Garland C. Dempsey. We do not understand how James can complain of this.
We do not understand James to object to or complain of the proposition that $561.75 per month represents the reasonable monetary support needs of the children under the circumstances. Where, as here, *423 James has only been ordered to finance 50 percent of those material needs, and where that amounts to only 23 percent of his income, we have no inclination to disturb the Chancellor's decree.

VII.
Much of the energies of the parties and the trial judge have been consumed with squabbling over two rings. Previously, James had been ordered to return the rings to Marie. He then claimed he did not have them. The Chancellor then ordered James to give Marie the rings or their value.
The present assignment of error regards the Chancellor's finding that the rings had a value of $1250. We have carefully reviewed this part of the proceeding. We have particularly noted James' challenge to certain evidence offered by Marie to the effect that the two rings had a combined value of between $1600 and $1700.
Under all of the circumstances of this case, it is more than sufficient unto this day that on this issue we find no error and affirm.

VIII.
In the proceedings below, the Chancellor ordered that James pay to Marie the sum of $400 as attorneys fees. That award is here affirmed and, in addition thereto, James shall pay to Marie the sum of $200 to be applied toward her attorneys fees on this appeal.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, DAN M. LEE and PRATHER, JJ., concur.
BOWLING and HAWKINS, JJ., not participating.
NOTES
[1] It is not clear from the record whether this new employment was obtained before or after the divorce.
[2] We refer, of course, only to changes occurring up through the date of the last hearing below, October 29, 1981.
[3] There is no evidence in the record reflecting the combined monthly expenses of the children in May of 1979.
[4] See also our second premise in Section III above.
[5] James argues that the children's expenses have not increased. We have fairly stated all of the testimony on this point in Section II(A) above. The trial judge obviously resolved the issue against James. Under our fourth preliminary premise stated in Section III above, this question of ultimate fact has been foreclosed.
[6] At oral argument, James' counsel readily conceded that it was to be expected that James' earnings would increase over their May 1979 level. In fact, counsel advised us that prior to the disintegration of his first marriage, James had consistently earned far more than his May 1979 pay level.
[7] We take judicial notice that lawyers in the practice of their craft of private lawmaking draft thousands of escalation clauses in a great variety of contractual contexts each year. Here is but another in the lawyer's string of creative successes in helping people to cope with the ever changing circumstances in which they find themselves.
[8] Just how the escalation clause should be drafted initially should be the subject of negotiation and agreement. What it ought be tied to  inflation rate, father's income, children's expenses  will vary from case to case, as will the designation of intervals at which child support will be escalated. In some cases it may be reasonable to provide for a reduction in support from the non-custodial parent where that party's earnings decrease. Great latitude and discretion here as elsewhere should be afforded the chancellor in determining what is "adequate and sufficient".
[9] We recognize that the chancellor cannot make the parties agree to an escalation clause. Yet he clearly may refuse to approve the separation agreement, and thus refuse to grant the divorce, if the parties do not include it. Here we note a major defect in Section 93-5-2. It requires that the parties voluntarily agree on all custody and monetary matters before the divorce can be granted on grounds of irreconcilable differences. This has produced the less than desirable situation where one party or the other  generally the husband wanting to keep his child support obligation to a bare minimum  engages in plain and simple blackmail: "If you want this divorce, you'll agree to my terms on money matters". He relies on the normally salutary practice of chancellors of approving agreements negotiated with each party represented by competent counsel. If only alimony was thus bargained, we would not be so concerned. We know and see that innocent children, hurt enough by the divorce itself, are deprived of needed support by this legislatively sanctioned blackmail. We urge that the legislature at the 1984 regular session act on this matter.
[10] We emphasize that nothing we say here in any way rests upon any assumption by us that Garland Dempsey, as stepfather, has a legally enforceable obligation to support these two children. Under facts such as those present here, Dempsey has no such obligation even though he stands in loco parentis to the children, the general and unsupported suggestion in Bunkley and Morse's Amis, Divorce and Separation in Mississippi 233 (1957) to the contrary notwithstanding. We are inclined to the view taken by the Supreme Court of Iowa in Mears v. Mears, 213 N.W.2d 511 (Iowa 1973). The lower court had denied a child support modification petition partly on the ground that Mrs. Mears' new husband stood in loco parentis and was obligated for their support. On appeal, the Iowa Supreme Court held:

"When a stepfather has taken into his home his wife's children by a former marriage ... the question of his duty to support his wife's children while in his home should be limited to the extent their being in his home may have increased the cost of their maintenance by reason of a higher living scale than that experienced during the marriage of their father and mother." 213 N.W.2d at 518.
On different facts, a different result may follow. Where for whatever reason the natural father is unable to provide support, where the stepfather as an incident to the new marriage has agreed to support the children, or where he does so over a period of time and the mother and the children in good faith rely to their detriment on that support  in these and other situations  the best interests of the children and the equities of the particular case may be sufficient to require entry of a child support decree against a stepfather.
[11] By "support" we include both monetary and "in kind" services. The custodial parent who in fact provides transportation service, washes the children's clothes, helps with homework and the like is entitled to have these "in kind" contributions assigned a reasonable monetary value which in turn should be considered as a part of that parent's overall contribution toward support of the children. This will often result in the non-custodial parent being required to pay more in out of pocket outlay than the custodial parent pays.
[12] This will generally be so whether the father is the custodial parent or not.
[13] See footnote 11, supra.