# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01153-SCT

*TANYA DALE WRIGHT SANDERSON*

*v.*

*HOBSON L. SANDERSON, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2012 |
| TRIAL JUDGE: | HON. TALMADGE D. LITTLEJOHN |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JANELLE MARIE LOWREY |
| | ROY O. PARKER |
| ATTORNEYS FOR APPELLEE: | GREGORY M. HUNSUCKER |
| | JAK MCGEE SMITH |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 12/11/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     The instant matter arises from the financial portion of a bifurcated divorce trial. Tanya Dale Wright Sanderson and Hobson L. Sanderson divorced after seventeen years of marriage. When Tanya and Hobson married in 1994, Tanya signed a prenuptial agreement the day before their marriage, and upon divorce, the chancellor enforced the terms of the agreement. Tanya appealed. She argues that the prenuptial agreement is procedurally and substantively unconscionable. She also claims, among other things, that the chancellor erred in not finding a joint bank account contained commingled, marital property. We affirm the

trial court on its finding that the prenuptial agreement is not procedurally unconscionable. We reverse and remand for further proceedings on whether the prenuptial agreement is substantively unconscionable. We also hold that certain funds, used for familial purposes, kept in a joint bank account created after the marriage began, do not fall within the parameters of the prenuptial agreement.

## FACTS AND PROCEDURAL HISTORY

¶2.     After dating for two years, Tanya Sanderson and Hobson Sanderson married on July 23, 1994, in Decatur, Alabama. Hobson was a sixty-two-year-old businessman. He owned Sanderson Construction and Sanderson Ready-Mix. The value of his assets at the time of marriage was approximately $3,580,000. Tanya was twenty-eight years old, and she had attended one year at a four year college studying music and one semester at a community college. She also had about five years of clerical experience as a deputy clerk at the Lee County Chancery Clerk's office. The value of her assets at the time of marriage was about $135,000, and she had a young daughter.

¶3.     The parties decided to marry only a few weeks before the wedding ceremony. The ceremony was a small and casual event, and no formal invitations were sent. Two weeks prior to the ceremony, Hobson approached Tanya regarding the execution of a prenuptial agreement. Hobson's attorney prepared the agreement and told Hobson to encourage Tanya to seek outside legal counsel. The agreement contained a signature line for Tanya's attorney. Hobson's brother and CPA for Hobson's construction company, Tom Sanderson, prepared Hobson's financial statement to be attached to the agreement. Tanya prepared her financial statement, and she gave it to Tom on July 18 or 19. The final agreement for the parties to

2

sign, that was supposed to have the financial statements attached to it, arrived the morning of July 22 – the day before the wedding.

¶4.    The agreement eliminated all rights to spousal support, and it deemed all property owned before marriage and all property acquired during the marriage to remain separate property if traceable.  Specifically, it stated that:

> WHEREAS, the parties desire that all property now owned by each and set forth herein on the appropriate Exhibits or any property hereafter acquired by each that shall be traceable to proceeds or appreciation from their separate property as set forth herein, shall for testamentary, intestate succession, and for their lifetimes and for any and all other purposes, be free from any claim of the other that may arise by reason of the contemplated marriage, notwithstanding any and all State laws to the contrary; any property acquired after the marriage not acquired as a result of the separate property as defined herein shall not be subject to this Agreement:
>
> IT IS, THEREFORE, AGREED THAT:
>
> . . .
>
> After the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, real and/or personal, whether now owned or hereafter acquired, and each of them shall have and maintain, regardless of circumstances or change of circumstances, the absolute and unrestricted right to dispose of and maintain use and retain the use and ownership of such separate property, free from any claim that may be made by the other by reason of or as a result of their marriage, and with the same effect as if no marriage had been consummated between them, notwithstanding any State laws to the contrary; and each party waives and releases all rights, statutory or otherwise, in and to the other's property described above at its present value, in addition to any appreciation in value, following the marriage, that may arise by law as a result of the marriage of the parties.

Further, the agreement stated that neither party was entitled to alimony or any part of the other party's "investments, earnings, gifts, or inheritance." The agreement also covered what

3

each party would receive upon the death of the other party. Tanya would receive $100,000 from Hobson's estate, and Hobson would receive $20,000 from Tanya's estate.

¶5.     On July 22, the day before the wedding, Hobson gave the agreement to Tanya and requested she have an attorney sign it. Tanya testified that the first time she saw the agreement was on July 22, and she took the agreement to the law office of her cousin, Jimmy Doug Shelton. Tanya discussed the agreement with Shelton for about ten minutes before she convinced him to sign it. Shelton testified that Tanya's number one concern was Shelton's signature and that she did not seem to want legal advice about the agreement. Tanya appeared eager to drive to Decatur to finish planning the wedding. Shelton told Tanya that the agreement was one-sided, and he needed more time to review it. Tanya stated that she and Hobson would not divorce; Shelton signed the agreement.

¶6.     At trial, witnesses presented conflicting testimony as to when Tanya signed the agreement and as to whether the financial disclosures were attached to the agreement when she did. Tanya testified she signed the agreement after the wedding at Hobson's request. Hobson testified that Tanya signed it before the wedding. Hobson further testified that the financial disclosures were attached to the agreement at the time Shelton signed it. However, Tom also testified that the financial disclosures had not been initialed on each page like the agreement. Tom stated that he had tried to contact Tanya to have her come to his office, but she was already in Decatur, Alabama. Tanya initialed each page about a week after the wedding, and she testified that she had not seen the financial disclosures until she initialed them after the wedding.

¶7.     Tanya testified that she did not understand the extent of her rights that she was forfeiting by signing the agreement, and if she had understood, she would have postponed the wedding. She further testified that Hobson did not want her to work after their marriage and that he promised to take care of her for the rest of her life. Tanya stated that she was generally aware of Hobson's wealth, but he was secretive about it. About a year or two after they married, Tanya and Hobson opened a joint banking account, and Tanya deposited Hobson's salary checks into the account each month. They filed joint tax returns. However, the child support Tanya received from her daughter's father accumulated and remained in a separate account. The child support money has since been used for the daughter's college expenses.

¶8.     After the parties filed for divorce, a hearing was held on whether the prenuptial agreement was enforceable. The court held the agreement was enforceable. In 2010, the trial court bifurcated the trial. The first portion of the bifurcated trial was the grant of divorce; Tanya was granted a divorce on the ground of cruel and inhuman treatment. The second portion of the trial was division of financial assets.

¶9.     During the financial portion of the trial, the chancellor found the prenuptial agreement to be enforceable, and the chancellor awarded assets as per the agreement. The parties were awarded their separate property: Hobson was awarded all of his corporate assets, multiple real properties, six financial accounts, and various personal items such as furniture, guns, and jewelry. Tanya was awarded two financial accounts, a piece of real estate that had been deeded to her by her parents, and various personal property classified as gifts, including hunting trophies, guns, furniture, art, a motorcycle, and jewelry.

5

¶10. The court also specifically found that the joint checking account was a "clearing house to facilitate the transfer of funds," and therefore, it was traceable to the source of the income, Hobson, and was his separate property. One of the investment accounts in Hobson's name had been funded in part with money from the joint account, but it remained separate. The court found that the additional account in which the child support money was accruing was not subject to distribution because it was for the benefit of the child.

¶11. The court valued Tanya's separate property at approximately $424,597.01, and it valued Hobson's separate property at $3,544,806.00. Tanya appealed.

## ISSUES

¶12. On appeal, Tanya brings sixteen issues classified into four general categories: (I) the prenuptial agreement, (II) commingling of marital assets and the improper classification of investment accounts and bank account, (III) the distribution of marital property, and (IV) the mislabeling of property Tanya conveyed to her parents. Hobson presents three broader issues concerning whether the chancellor erred in his application of the prenuptial agreement.

## STANDARD OF REVIEW

¶13. Contract interpretation is a question of law and is reviewed *de novo*. ***Harris v. Harris***, 988 So. 2d 376, 378 (Miss. 2008) (citing ***Warwick v. Gautier Util. Dist.***, 738 So. 2d 212, 215 (Miss.1999)). However, the Court considers the chancellor's decision of whether to enforce a prenuptial agreement under the abuse of discretion or manifest error standard. ***Mabus v. Mabus***, 890 So. 2d 806, 810 (Miss. 2003). The Court will not disturb the findings of the chancellor unless they are "manifestly wrong, clearly erroneous, or applied the wrong legal standard." ***Id.*** (citing ***McNeil v. Hester***, 753 So. 2d 1057, 1063 (Miss. 2000)). The Court

6

also applies a limited standard of review for the distribution of property in divorce cases. *Owen v. Owen*, 798 So. 2d 394, 397 (Miss. 2001) (citing *Reddell v. Reddell*, 696 So. 2d 287, 288 (Miss. 1997)). The chancellor's ruling of the division and distribution "will be upheld if it is supported by substantial credible evidence." *Owen*, 798 So. 2d at 397 (quoting *Carrow v. Carrow*, 642 So. 2d 901, 904 (Miss. 1994)). "This Court will not substitute its judgment for that of the chancellor '[e]ven if this Court disagree[s] with the lower court on the finding of fact and might . . . [arrive] at a different conclusion.'" *Owen*, 798 So. 2d at 397-98 (quoting *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss. 1978)).

## DISCUSSION

I. **Whether the chancellor erred in finding that the prenuptial agreement was procedurally conscionable.**

¶14.    Mississippi law concerning prenuptial agreements is not well settled. However, it is well settled that prenuptial agreements are enforceable like any other contract. *Estate of Hensley v. Estate of Hensley*, 524 So. 2d 325, 327 (Miss. 1988); *see also Smith v. Smith*, 656 So. 2d 1143, 1147 (Miss. 1995); *Mabus v. Mabus*, 890 So. 2d 806, 818 (¶53) (Miss. 2003).   Prenuptial agreements also have the heightened requirement of being fair in the execution. *Estate of Hensley*, 524 So. 2d at 327. "Fair in the execution" means that the agreement must be entered into voluntarily, and each party must disclose his or her financial assets. *Id.*, *see also Mabus v. Mabus*, 890 So. 2d at 818-19 (¶53). We hold that the chancellor did not err in finding the agreement was voluntarily entered into with fair disclosure.

7

¶15. Fair disclosure can be found either by the parties providing financial disclosure statements or by their independent knowledge of each other's financial state. In the case *sub judice*, the chancellor resolved the conflicting testimony about whether the financial statements were attached in Hobson's favor, finding that they were attached to the prenuptial agreement. Upon review, we cannot hold that the chancellor's finding was manifest error.

¶16. Tanya also had the advice of independent counsel that the agreement was one-sided, and she chose to proceed. Independent counsel is not necessarily required in order for a prenuptial agreement to be procedurally conscionable. *Mabus*, 890 So. 2d at 821 (¶ 63). However, whether parties had a reasonable opportunity to consult with independent counsel if they so desired is an important consideration in evaluating the overall procedural conscionability of the contract. *Id.* Although the agreement was signed in close proximity to the wedding, the informal nature and scope of the wedding, combined with the presence of independent counsel and the attachment of the financial disclosures, does not indicate a level of coercion or surprise that would make Tanya's entry into the agreement involuntary. Accordingly, we hold that the chancellor did not err in finding the prenuptial agreement to be procedurally conscionable.

## II. Whether the chancellor erred in failing to consider the substantive unconscionability of the prenuptial agreement.

¶17. Confusion has arisen in Mississippi as to whether courts should consider the substantive unconscionability of prenuptial agreements. The chancellor in the instant case stated in his Final Decree of Divorce that "some states look at both substantive and procedural unconscionability, Mississippi courts do not." The lack of clarity in the law has

8

arisen perhaps because of the *Mabus* Court's use of the phrase "fundamental fairness" instead of "substantive unconscionability." The *Mabus* Court wrote as follows:

> The claim that the estates of the parties are so disparate that it questions fundamental fairness is of no consequence. An antenuptial agreement is as enforceable as any other contract in Mississippi. Of course, there must be fairness in the execution and full disclosure in an antenuptial agreement in Mississippi.

*Id.* at 821 (¶ 64) (internal citations omitted). The above-quoted language constitutes a holding that the *Mabus* prenuptial agreement was not fundamentally unfair but falls short of a blanket prohibition against considering substantive unconscionability in all prenuptial agreements. The *Mabus* Court's language does not prohibit considering substantive unconscionability in prenuptial agreements as a rule of law. *Mabus* also makes two further assertions that have confused our law of prenuptial agreements.

¶18. First, *Mabus* states that a prenuptial agreement is a contract like any other contract that is subject to the same rules of construction and interpretation applicable to contracts. *Mabus*, 890 So. 2d at 819 (¶53) (citing *Estate of Hensley*, 524 So. 2d at 327). However, prenuptial agreements cannot be contracts like any other if courts cannot consider whether a prenuptial agreement can be substantively unconscionable. "The law of Mississippi imposes an obligation of good faith and fundamental fairness in the performance of *every* contract . . . this requirement is so pronounced that courts have the power to refuse to enforce any contract . . . in order to avoid an *unconscionable* result." *Sawyers v. Herrin-Gear Chevrolet Co.*, 26 So. 3d 1026, 1034-35 (¶ 21) (Miss. 2010) (emphasis added); *see also Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 705 (¶13) (Miss. 2009).

9

¶19. Within contract law, there are many different types of contracts. The Legislature has carved out a remedy for unconscionable sales contracts. *See* Miss. Code Ann. § 75-2-302 (Rev. 2002). However, Section 75-2-302 has been applied to other types of contracts, such as arbitration contracts. *Covenant Health & Rehab. of Picayune*, 14 So. 3d at 706. Similarly, the Court has analyzed the unconscionablity of domestic relations contracts. *See id.* ("We also have found contracts to be unconscionable for clauses other than arbitration agreements."); *In the Matter of Johnson's Will*, 351 So. 2d 1339 (Miss. 1977) (considering unconscionability for a contract between a husband and wife preventing a wife from revoking her husband's will); *West v. West*, 891 So. 2d 203, 213 (Miss. 2004) ("A contract may be either procedurally or substantively unconscionable."). Accordingly, because prenuptial agreements are contracts like any other, substantive unconscionability must be considered.

¶20. The Court has even gone further and defined an unconscionable contract in domestic relations contracts. "[I]t is also the law that courts of equity will not enforce an unconscionable contract. In *Terre Haute Cooperage, Inc. v. Branscome*, 203 Miss. 493, 35 So. 2d 537 (1948), this Court defined an unconscionable contract as 'one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *In re Johnson*, 351 So. 2d at 1341; *see also West*, 891 So. 2d at 213 (¶ 27) ("Substantively, the terms of the property settlement agreement are less than desirable, but we cannot say that no spouse in his or her right mind would agree to what is, at worst, a begrudging but generous offer . . . to provide alimony . . . .").

¶21. Second, the *Mabus* Court appears to have considered substantive unconscionability after stating fundamental fairness was of no consequence. In *In re Johnson*, the Court

10

explained how to determine if a contract is unconscionable: "In determining whether this contract was unconscionable, it is necessary to analyze what the widow was to receive under the will in contrast to her rights absent the will under the laws of descent and distribution." *In re Johnson*, 351 So. 2d at 1342. In other words, the Court considered what the wife would have received if the contract had not existed and if the wife was able to renounce her husband's will. Similarly, even in light of the premarital agreement, the *Mabus* Court considered the *White* factors for lump sum alimony and the *Ferguson* factors for distribution of the marital property. *Mabus*, 890 So. 2d at 821-23 (¶¶65-71) (citing *White v. White*, 557 So. 2d 480, 483 (Miss. 1989); *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994)). Also, in *Estate of Hensley*, in determining whether the prenuptial agreement between the husband and wife was enforceable, the Court noted that "a full reading of the record divulges that Mr. Hensley had actually been very benevolent." *Estate of Hensley*, 524 So. 2d at 328. Thus, Mississippi has implicitly considered the substantive unconscionablity of premarital agreements. We hold that, given the contract law on unconscionability, substantive unconscionability for premarital agreements must be considered by trial courts.

¶22.    Contract law has largely, with the exception of the sale of goods, remained common law. Therefore, inevitably, contradictions arise. Unconscionability looks at the terms of the contract. *See West*, 891 So. 2d at 213. Unconscionability also looks at the circumstances existing *at the time the contract was made*. *Vicksburg Partners, L.P. v. Stephens*, 911 So. 2d 507, 517 (¶ 22) (Miss. 2005), *overruled on other grounds by Covenant Heath & Rehab.*

11

*of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009).[1] We

hold that substantive unconscionability feasibly could be measured at the time the prenuptial

agreement is made; measuring it at the time the agreement is made would maintain

consistency in the law. It also would ensure that the Court does not "relieve a party to a

freely negotiated contract of the burdens of a provision which becomes more onerous than

had originally been anticipated." *Mabus*, 890 So. 2d at 819 (¶53) (quoting *Estate of Hensley*,

524 So. 2d at 328).

¶23. Because the chancellor in the case *sub judice* operated under the erroneous conclusion

that the prenuptial agreement could not be analyzed for substantive unconscionability, we

reverse and remand the case for him to do so. We decline the dissent's invitation to conduct

that analysis for the first time on appeal, because the error consisted of making no finding

at all rather than the wrong finding. In other words, there is no decision on point for us to

analyze for error.

**III.    Whether the chancellor erred in finding joint bank account funds
were not commingled.**

¶24. Tanya argues the chancellor improperly found certain assets not commingled for

purposes of making an equitable distribution of marital property. Included in the charge of

error is a joint bank account. The chancellor found that the joint bank account was a

---

[1]*Vicksburg Partners* held two clauses of an arbitration agreement to be unconscionable. *Vicksburg Partners*, 911 So. 2d at 523-24 (¶¶42, 45). Subsequently, in *Covenant Health*, the Court considered the many jurisdictions that have found contracts to be unconscionable. *Covenant Health*, 14 So. 3d at 703-07 (¶¶26-33). Under the same basic rules of unconscionability, the Court held that an arbitration contract, similar to the one in *Vicksburg Partners*, was completely unconscionable. *Id.* at 525-26 (¶ 49).

clearinghouse for Hobson's money and could be traced back to Hobson. He accordingly held that, under the prenuptial agreement which provided that property that could be traced to one spouse belonged to that spouse, the money traceable to Hobson was not commingled and not a marital asset.

¶25. We hold that the money deposited into the joint checking account became a marital asset subject to equitable division because of its familial use. *See A & L, Inc. v. Grantham*, 747 So. 2d 832, 838 (Miss. 1999) ("[N]on-marital assets may be converted to marital assets if they are commingled with marital assets or used for familial purposes, absent an agreement to the contrary.") (citing **Heigle v. Heigle**, 654 So. 2d 895, 897 (Miss. 1995)). While it is true that Hobson was the only one depositing money into the account, and that the funds could be traced solely to him, Mississippi's jurisprudence clearly establishes that property is presumed to be marital property *unless* it can be shown to have been exchanged for a separate, and not a familial, asset or function. **Maslowski v. Maslowski**, 655 So. 2d 18, 20 (Miss. 1995).

¶26. In the case *sub judice*, the chancellor treated the joint account as separate because the monies deposited could be traced solely to Hobson. The chancellor determined that Tanya made no contributions. However, the chancellor erred by failing to address the familial use of the funds and Tanya's contribution in helping to disburse the funds for the familial purposes. Under the law cited above, her contributions and the familial use to which the money in the joint account was put changed the legal nature of the money in the account from separate property subject to tracing to marital property. Absent a contractual provision that indicates the parties intended familial use monies to be separate and subject to tracing,

13

thereby waiving the operation of law that so converts it, we are constrained to hold the parties intended for our law regarding familial use to apply.[2]

¶27. We acknowledge that Tanya and Hobson could have drafted the prenuptial agreement to address funds commingled for familial use, *see A & L, Inc.*, 747 So. 2d at 838; *Heigle*, 654 So. 2d at 897, but they did not. In the absence of such contractual language, the law regarding commingled, familial use money applies.

**CONCLUSION**

¶28. Although we herein express no opinion regarding whether the contract at issue in the instant case is substantively unconscionable, we hold that prenuptial agreements are contracts like any other, and therefore subject to substantive unconscionability analysis. Furthermore, we reverse the chancellor's finding that the joint bank account funds were not commingled. After due consideration of the other issues raised, we discern no other errors. Accordingly, we remand the case to Monroe County Chancery Court for a determination of whether the prenuptial agreement was substantively unconscionable at the time it was entered into by the parties and other further proceedings consistent with the instant opinion.

¶29. **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., LAMAR, KITCHENS, PIERCE, AND KING, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY CHANDLER, J. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE**

---

[2]It is interesting to note that the *Mabus* Court placed great importance on the fact that, in *Mabus*, the parties "meticulously maintained separate accounts for their premarital separate property and for the gifts and inheritances that they each received during the marriage." *Mabus*, 890 So. 2d at 823 (¶ 71). By creating the join account at issue, the parties in the case *sub judice* were not so meticulous.

14

**WRITTEN OPINION JOINED BY DICKINSON, P.J. RANDOLPH, P.J., JOINS IN PART.**

**RANDOLPH, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶30.    I concur with part I of the majority's opinion, and I join in part only with Justice Chandler's dissenting opinion, specifically ¶33,¶34, and ¶37. My dissent as to part II of the majority follows. We should consider the circumstances at the time the contract was made to determine whether unconscionability exists. (Maj. Op. ¶22). Furthermore, this Court will not "relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than originally anticipated." (Maj. Op. ¶22 (citing *Mabus v. Mabus*, 890 So. 2d 806, 819 (Miss. 2003) (citations omitted)). Here, it is undisputed that Tanya sought and obtained legal advice from independent counsel, who instructed her that the agreement was one-sided. She chose to disregard that substantive advice and executed the negotiated agreement. Based on the facts specific to this case, no court should consider substantive unconscionability.

¶31.    Although the chancellor's decision was indeed premised on the wrong reason, our appellate courts have regularly affirmed trial courts that reach the right result albeit for the wrong reason. *See State v. Buckhalter*, 119 So. 3d 1015, 1019 (Miss. 2013); *Powell v. Crawley*, 106 So. 3d 864, 866 (Miss. Ct. App. 2013); *Tedford v. Dempsey*, 437 So. 2d 410, 418 (Miss. 1983) (citing *Huffman v. Griffin*, 337 So. 2d 715, 723 (Miss. 1976)). Accordingly, I would find that review for substantive unconscionability is not required in this case under the facts presented.

**CHANDLER, J., JOINS THIS OPINION IN PART.**

15

**CHANDLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶32.   I respectfully dissent. Given that the contract formation was procedurally conscionable, I do not find that the facts of this case warrant a review of the substantive conscionability of the property-division provisions at the time of contract formation. At most, this Court should consider whether to isolate the spousal-support waiver and review it for conscionability at the time of divorce. Additionally, this Court treats contract conscionability as a question of law this Court can determine on appeal without remand. *Caplin Enterprises, Inc. v. Arrington*, 145 So. 3d 608, 614 (Miss. 2014). To promote judicial efficiency and preclude unnecessary rounds of appeals in the future, the majority should accept that task here and remand only if a determination of conscionability requires an alternate division of property and alimony than the lower court already has made.

¶33.   While I do not believe that prenuptial agreements should be completely immune from substantive-unconscionability considerations, I also firmly believe that the doctrine of unconscionability under general contract law cannot apply to prenuptial agreements.[3] The decision to marry is not an arms-length commercial transaction, but rather is grounded in personal, moral, religious, and emotional considerations that are off-limits to strangers to the relationship. By imposing the contract doctrine of unconscionability on prenuptial agreements, the majority leaves our chancellors to forage in the dark, with no guidance as to many issues, for instance, whether a prospective marriage partner with children from a

---

[3] In recognition that prenuptial contracts involve unique concerns, a growing majority of states have adopted some version of the Uniform Prenuptial Agreement Act.

16

previous marriage may protect and provide for those children in a prenuptial agreement, without fear that a court will void the agreement as unconscionable and leave the children at the mercy of the former spouse.

¶34.    This Court made very clear in *Mabus* that parties are free to bind themselves to property-division agreements that may be or may become one-sided. We stated in that case:

> . . . the chancellor determined that Julie freely negotiated the agreement, and the chancery court would not relive her of the obligation even if it was a bad bargain. The claim that the estates of the parties are so disparate that it questions fundamental fairness is of no consequence. An antenuptial agreement is as enforceable as any other contract in Mississippi. *Smith*, 656 So. 2d at 1147. Of course, there must be fairness in the execution and full disclosure in an antenuptial agreement in Mississippi. *Id*. Both Julie and Ray signed a valid agreement. Had the tables been turned and Julie's estate increased in value while Ray's estate decreased in value from the time of the agreement, Julie would presumably want this Court to uphold the agreement to her benefit. *The parties made this agreement to protect their assets. The fact that over time one party had the fortune of increasing their assets is not a reason to abolish or invalidate the agreement. At the time the agreement was made the parties wanted to protect premarital and inheritance assets, the agreement has done exactly what it was intended to do.* All contracts involve some type of risk; this agreement was no different.

*Mabus v. Mabus*, 890 So. 2d 806, 821 (Miss. 2003) (emphasis added). In light of the whole Court's agreement that this contract was procedurally conscionable, the reasoning above should control this Court today to uphold the property-division provisions of the contract.

¶35.    However, I would acknowledge that a prenuptial contract can be conscionable in its property divisions but unconscionable in its alimony provisions. Permitting an isolated review of spousal-support provisions and waivers at the time of divorce is a good way to approach a contract that both is and is not like any other contract. Marriage is hardly your ordinary consideration. It is extremely difficult if not impossible to predict how life will

17

require the responsibilities of a marriage to be divided regarding noneconomic contributions. Electing economic dependence for the purpose of furthering the goals of the marriage can prevent an individual from accumulating economic skills and assets he or she otherwise would have secured over time. Public policy favors protecting individuals who place themselves in that position.

¶36.   Permitting this bifurcated review of property division and spousal support would better enable attorneys to draft enforceable prenuptial contracts with confidence and would give chancellors more accessible tools for deciding challenges to such agreements. I disagree with the dissent that a substantive review of the property divisions of the contract is appropriate, given that the contract formation was procedurally conscionable. At most, this Court should conduct a limited review of the waiver of spousal support for fairness at the time of divorce.

¶37.   I also disagree with the majority's conclusion that the prenuptial agreement does not adequately provide that money kept in a joint account and used for familial purposes is covered by the prenuptial agreement.[4] One of the fundamental characteristics of contract law is that contracts are used to create an alternate controlling law to the default common law. The use of separate funds for marital purposes can result in a finding that the funds are marital property subject to division, *absent an agreement to the contrary*. *See Johnson v.*

---

[4] The creation of a joint banking account, while creating a right of withdrawal, does not automatically act to create an ownership interest. *Smith v. Smith*, 656 So. 2d 1143, 1147 (Miss. 1995).

*Johnson*, 650 So. 2d 1281; *A &L, Inc., v. Grantham*, 747 So. 2d 832 (Miss. 1999). Here,

we have such an agreement. The agreement provides in part:

> . . . *any property hereafter acquired by each that shall be traceable* to proceeds or appreciation from their separate property as set forth herein, shall for testamentary, intestate succession, and for their lifetimes and for any and all other purposes, *be free from any claim of the other that may arise by reason of the contemplated marriage, notwithstanding any and all State laws to the contrary* . . . .

I cannot agree with the majority that the common-law approach to marital use of property

supercedes the contract. The opposite is true. The contract should control.

¶38.    For all these reasons, I therefore respectfully dissent.

**DICKINSON, P.J., JOINS THIS OPINION. RANDOLPH, P.J., JOINS THIS OPINION IN PART.**